In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1183

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ARCHIE R. KENERSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 08-CR-40015—**Michael M. Mihm**, *Judge.*

ARGUED SEPTEMBER 15, 2009—DECIDED OCTOBER 30, 2009

Before POSNER, FLAUM, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Defendant-appellant Archie R. Kenerson challenges the circumstances of a traffic stop, the subsequent *Terry* search, and a police officer's resulting visual identification of crack cocaine in defendant-appellant's back jean pocket. The district court denied Kenerson's motion to suppress evidence after examining the testimony and viewing a reenactment of the *Terry* frisk.

For the following reasons, we affirm the district court's denial of a motion to suppress.

## I. Background

On February 26, 2008, a grand jury indicted Archie R. Kenerson on one count of possession with intent to distribute crack cocaine. On April 16, 2008, Kenerson filed a motion to suppress evidence. On May 15, following an evidentiary hearing, the district court denied the motion. On September 16, 2008, Kenerson pleaded guilty to the charge in the indictment, reserving his right to appeal the denial of his motion. On January 23, 2009, the district court sentenced Kenerson to a term of 120 months of imprisonment, 8 years of supervised release, and a $100 special assessment. Kenerson appeals from the district court's denial of his motion to suppress.

The material facts describing the procurement of the evidence are not in dispute. In response to complaints of gun violence and drug activity from residents of Rock Island, Illinois, Officers Richard Carlson and Douglas Williams began a special patrol of the Century Woods housing complex in early 2008. On Jan. 15, 2008, around 10:30 p.m., a narcotics officer passed on a tip from an unknown source to Carlson and Williams that one Bryant Williams delivered up to an ounce of crack cocaine to a Century Woods apartment in a white sport-utility vehicle and that other vehicles would soon be pulling up to the apartment for a drug exchange. Officer Carlson began surveillance of the address, 1415 3rd Street, while Officer Williams parked east of the apartment complex.

After forty-five minutes of surveillance through a set of binoculars from a distance of approximately seventy-five feet, Officer Carlson observed a white Plymouth Acclaim with two occupants park next to the apartment building. The car remained running with its lights on. After a few minutes, a heavy-set man exited the building, walked over to the car, and leaned into the front passenger window. After appearing to converse with the passengers, the man walked away and called someone on his cell phone. Next, a smaller black male wearing an oversized white t-shirt and baggy jeans walked out of the apartment. This individual was later identified as defendant-appellant Kenerson. Kenerson spoke to the heavy-set man in front of the car for a few minutes and then, from the perspective of Officer Carlson, Kenerson exchanged something with the heavy-set man. Kenerson next got into the back seat of the Plymouth; the larger man stayed near to the car, appeared to exchange something with Kenerson a bit later, and returned to the apartment.

At that point, the car drove away. Officer Carlson radioed Officer Williams, describing the vehicle and stating his belief that he had witnessed a drug deal. Officer Williams spotted the car, began following it, and called the police department to get a K-9 officer to the area. Some distance later, Officer Williams pulled the Plymouth over after its driver failed to activate a turn signal within the one hundred feet prescribed by the Illinois Motor Vehicle Code, 625 ILCS 5/11-804(b), instead doing so only five feet before the turn.

While Officer Williams approached the car, he observed Kenerson move around in the back seat and shone a

flashlight on him; Kenerson then stopped moving. When he got to the car, Williams asked the driver, later identified as Anna Byrd, if she knew the back seat passenger. Byrd said she did not and that she gave him a ride so he could buy beer because she enjoyed helping people. Officer Williams then asked the occupants of the vehicle to step out of the car so Officer Sharp, who had just arrived on the scene with a K-9 unit, could carry out a free air search of the car. The driver consented to the sniff test.

Once Kenerson exited the car, Officer Williams ordered him to put his hands on the car so Williams could carry out a protective pat-down. During the pat-down, Williams felt a bulge in Kenerson's left rear pocket that was not consistent with the size or shape of a weapon. Williams asked Kenerson what was in the pocket. Kenerson responded "nothing" and opened the pocket up, pulling it away from his waistband. Williams saw three small "baggie corners" that he believed contained crack cocaine. Officer Williams then arrested Kenerson. During the evidentiary hearing, Kenerson put on the pants he was wearing at the arrest and the parties reenacted the pat-down in court.

## II. Discussion

A. Probable Cause to Stop the Automobile

On a motion to suppress evidence, this Court reviews a district court's legal conclusions, including determinations of probable cause and reasonable suspicion, de novo

and the district court's factual findings for clear error. *United States v. Thompson*, 496 F.3d 807, 809 (7th Cir. 2007).

Defendant-appellant argues that the initial stop was illegal because the statute giving rise to the traffic violation does not make sense. Kenerson claims that because the defendant came to a full and complete stop, there was no traffic at the intersection, and a hypothetical driver who decided that he wanted to turn right only after stopping could not comply with relevant provision no matter how hard he tried, the code yields "an absurd result" and cannot provide a lawful basis for a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1 (1968).

Kenerson does not cite any cases supporting the novel proposition that subjective inconvenience negates the binding power of valid laws. Kenerson also acknowledges that under *Whren v. United States*, 517 U.S. 806 (1996), an officer can carry out a traffic stop when given adequate legal and objective authorization regardless of the officer's subjective intent. *See also United States v. Trigg*, 878 F.2d 1037, 1040-41 (7th Cir. 1989). Accordingly, we affirm the district court's finding that a violation of the relevant provision of the Illinois Motor Vehicle Code, routine and safe though it might have been, gave Officer Williams probable cause to stop the Plymouth Acclaim. *See United States v. Williams*, 106 F.3d 1362, 1365 (7th Cir. 1997) (police were authorized to stop vehicle for untimely turn signal despite the minor nature of offense).

B.  Reasonable Suspicion of Safety Risk Sufficient for a
    *Terry* Frisk

Kenerson next argues that Officer Williams lacked
specific and articulable facts necessary to form a belief
that Kenerson was armed or dangerous and conduct a
protective frisk following the traffic stop. Under *United
States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001), "a
protective pat-down search . . . is appropriate only if
the agents have at a minimum some articulable suspicion
that the subject is concealing a weapon or poses a danger
to the agents or others . . . ." The standard is less demand-
ing than probable cause and requires only "a minimal
level of objective justification for making the stop."
*Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Courts must
determine reasonable suspicion based on the totality of
circumstances, not by considering each factor in isola-
tion. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). When
evaluating a situation, officers are entitled to consider
practical considerations of everyday life, *United States v.
Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (quoting *Ornelas
v. United States*, 517 U.S. 690, 695 (1996)), as well as the
prevalence of criminal activity in a particular location,
*United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002).

The government asserts that the combination of
factors surrounding Kenerson's traffic stop justifies a
reasonable suspicion that the defendant was armed. In
particular, it emphasizes the violent nature of the drug
trade, *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir.
1994) ("weapons are 'tools of the trade' of drug dealers"),
and the frequency of gun crime in the Century Woods area.

From an objective standpoint, these bits of information supplement an otherwise suspicious situation, give rise to a reasonable concerns about safety for Officer Williams, and justify a *Terry* frisk of defendant-appellant.

While the transaction taking place at 1415 3rd Street was unlikely to be a major drug deal—per the anonymous tip, the officers could not have expected much more than a few ounces of crack to change hands—it is an unfortunate fact of life that trade in controlled substances is dangerous for all involved. Dealers may arm themselves for protection against competitors, addicts, and the police. In fact, a rational drug dealer may well carry a gun, given these same realities and expectations. Officer Williams was aware of these trends; he had personally arrested armed individuals in the Century Woods area after he and Officer Carlson began their special detail. The peculiar interaction between the heavy-set man, Kenerson, and the passengers of the Plymouth in front of the apartment building also strongly suggested a covert exchange of some sort. At 11:30 p.m. on a January night, people generally don't walk up to a car, briefly talk to the drivers, walk away, call someone, talk to an acquaintance, follow the acquaintance to the car, and walk away for good, especially with minute-long pauses punctuating the actions. The suspicious nature of such activity was supplemented by the existence of a tip that drug deals would be going on at this specific address. Once pulled over, Kenerson made a furtive movement with his shoulders that made Williams concerned about the possible presence of a weapon in

the car. Finally, when Officer Carlson asked Byrd, the driver of the Plymouth, about whether she knew Kenerson, the man in her back seat, she claimed that she picked Kenerson up to get beer because he looked cold (Officer Williams previously witnessed an entirely different meeting between the two and notified Carlson accordingly). This attempt to obfuscate the nature of the encounter between Byrd and Kenerson makes the conclusion that an illegal transaction involving Kenerson had just transpired all the more likely. Together, these factors all justify a reasonable suspicion by Officer Williams that the rear-seat passenger of the Plymouth was a drug dealer who may be armed and dangerous. Appellant's invocation of *Sibron v. New York*, 392 U.S. 40 (1968), a case whose holding *Terry* and its progeny significantly narrowed, *see, e.g.*, *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993), does nothing to alter this conclusion. We therefore hold that the district court made a correct determination that Officer Williams validly carried out a *Terry* frisk of Kenerson.

C. Discovery of Crack Cocaine and Probable Cause
    for Kenerson's Arrest

Kenerson's final argument is that Officer Williams had no basis to believe the hard bulge he felt in Kenerson's pocket during the pat-down was a weapon or contraband. Appellant cites *United States v. Gibson*, 19 F.3d 1449, 1551 (D.C. Cir. 1994), which held that a hard, flat object did not reveal incriminating character sufficient to justify

further search. Kenerson further relies on the rule in *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993), that once a protective search establishes that the suspect is unarmed, all further fruits will be suppressed.

Here, however, the district court determined that Officer Williams saw the crack cocaine when Kenerson voluntarily opened his pocket in response to Williams's question about the lumps. Defendant does not challenge the validity of the initial question about the content of the pocket. Instead, defendant essentially asks this Court to reverse the district judge's finding that Officer Williams could and actually did see the three "baggie corners" at the bottom of the pocket during a nighttime traffic stop. The judge's determination that Officer Williams's testimony was credible rests upon a reenactment of the arrest using both the defendant and the pants in question. By contrast, defendant offers only concerns about the general improbability of the event. While the scenario where a police officer visually identifies drugs at the bottom of a jean pocket may be unlikely in the abstract, the district court found that exactly these events transpired during this specific arrest. We have no basis to conclude that this factual determination was clearly erroneous. Once Officer Williams saw the crack containers in plain view, he had probable cause to seize the contraband and arrest Kenerson. *United States v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003); *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997).

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Kenerson's motion to suppress evidence.