In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1334

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DENNIS OGLESBY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 08-CR-10065—**Michael M. Mihm**, *Judge.*

ARGUED NOVEMBER 9, 2009—DECIDED MARCH 10, 2010

Before EVANS and SYKES, *Circuit Judges*, and DER-YEGHIAYAN, *District Judge.*[*]

DER-YEGHIAYAN, *District Judge.* During an investigatory stop, a police officer conducted a pat-down frisk of Dennis Oglesby and found a handgun on his person. Oglesby was arrested and charged with one count of

[*] Hon. Samuel Der-Yeghiayan, District Judge for the Northern District of Illinois, is sitting by designation.

being a felon in possession of a handgun, in violation of 18 U.S.C. § 3231. Oglesby moved to suppress the handgun, arguing that the police officer did not have sufficient justification to conclude that Oglesby was armed or dangerous and therefore did not lawfully conduct a pat-down search of Oglesby. The district court denied Oglesby's motion to suppress the handgun based on the testimonies of several police officers who were present at the scene of the arrest. After entry of judgment, Oglesby filed a timely appeal challenging the district court's denial of his motion to suppress. For the following reasons, we affirm the district court's denial of the motion to suppress.

## I.  Background

On June 5, 2008, around 9:00 p.m., Dennis Oglesby was standing with a group of four or five men by a bus stop in a high-crime area of Peoria, Illinois. Police Officers Rory Poynter and Mike Featherstone were on patrol in the area and observed that the men were obstructing the sidewalk in violation of a city ordinance. After calling for back-up so that the police presence would approximate the number of men in the group, Officer Poynter and Officer Featherstone approached the group to discuss the ordinance violation. Almost immediately, Police Officer Mike Johnston and his partner also arrived on the scene in a squad car. After approaching the group, Officer Poynter and Officer Featherstone identified themselves to the group as police officers and Officer Poynter addressed one of the other men in the

group who was drinking alcohol in violation of another city ordinance.

During the investigatory stop, the officers observed that Oglesby looked from side to side, dropped his right hand down toward his right pocket, and separated himself from the group by taking a few steps backward while still facing Officer Poynter and Officer Featherstone. The officers also observed that Oglesby had angled his body away from Officer Poynter and Officer Featherstone so that they were unable to view Oglesby's right side. Oglesby was wearing loose jeans and a baggy T-shirt over another T-shirt, and therefore, the officers could not have observed any bulge beneath Oglesby's clothing indicating that Oglesby carried a weapon.

Upon seeing Oglesby drop his hand toward his right pocket, Officer Featherstone told Oglesby to show his hands, and Oglesby immediately complied. When Officer Featherstone asked the group to show identification, Oglesby again dropped his hand toward his right pocket. Officer Featherstone repeated to Oglesby the instruction to show his hands. Oglesby again immediately complied, claiming that he had been following Officer Featherstone's prior instruction to show his identification.

From his position behind Oglesby, Officer Johnston was not able to hear any of the conversation between Officer Featherstone and Oglesby, but Officer Johnston saw Oglesby backing away from Officer Featherstone and Officer Poynter while looking from side to side. Officer

Johnston also observed Oglesby repeatedly lower his right hand to his right side, and noted Oglesby's angled stance. In response to Oglesby's actions, Officer Johnston approached Oglesby from behind and grabbed the back of Oglesby's waistband to keep Oglesby from fleeing. Officer Johnston asked Oglesby to show his hands and Oglesby complied. Officer Johnston then asked Oglesby if he had any drugs or weapons on him and Oglesby replied that he did not. Despite Oglesby's denial, Officer Johnston put his right hand on the right side of Oglesby's waistband and felt the butt of a handgun that Oglesby was carrying. Oglesby was then arrested.

On August 20, 2008, a grand jury indicted Oglesby on one count of possession of a handgun by a felon. Oglesby pled not guilty and filed a motion to suppress the handgun found on him. On October 10, 2008, following an evidentiary hearing, the district court denied the motion. On October 17, 2008, Oglesby entered a conditional guilty plea and reserved the right to appeal the denial of his motion to suppress. On February 6, 2009, the district court sentenced Oglesby to 60 months of imprisonment. Oglesby appeals from the district court's denial of his motion to suppress.

## II. Discussion

The police officers properly approached Oglesby and his group. The issue before the court is whether the pat-down search of Oglesby was a violation of Ogelsby's constitutional rights. We review the district court's legal determination *de novo* and its findings of fact for clear

error. *United States v. Kenerson*, 585 F.3d 389, 392 (7th Cir. 2009).

The Fourth Amendment of the United States Constitution provides certain protections to the public from searches and seizures, but it does not bar all searches. In order to conduct an investigatory stop, also known as a "*Terry* stop," consistent with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), "an officer must be 'aware of specific and articulable facts giving rise to reasonable suspicion.'" *Jewett v. Anders*, 521 F.3d 818, 823-25 (7th Cir. 2008) (quoting in part *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994)). A reasonable suspicion requires "more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'" *Id.* (quoting in part *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Police officers are permitted to rely on their experience and training in forming a reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273-74, 122 S.Ct. 744, 750-51 (2002). Determining whether an officer had a reasonable suspicion is assessed considering the totality of the circumstances and "common-sensical judgments and inferences about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Wardlow,* 528 U.S. at 125, 120 S.Ct. at 676). During a *Terry* stop, a law enforcement officer can conduct a protective pat-down search only if the officer has "at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the [officer] or others . . . ." *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001).

Oglesby's arrest occurred at night in a location that was known to the officers to be a high-crime area plagued by drug trafficking and gun violence. While being present in a high-crime area cannot, in and of itself, support a particularized suspicion that a subject is committing a crime, an officer is permitted to consider a location's characteristics when assessing a situation. *Wardlow,* 528 U.S. at 124, 120 S.Ct. at 676; *see also United States v. Brewer*, 561 F.3d 676, 679 (7th Cir. 2009) (noting that the vehicle observed by officers "was the only vehicle on the road at that late hour in [a] high crime area"); *United States v. Jackson,* 300 F.3d 740, 746 (7th Cir. 2002) (permitting officers to consider the prevalence of criminal activity in a particular location when evaluating the reasonableness of an investigatory stop).

In addition, as the officers converged on the scene, Oglesby slowly retreated from the group while looking from side to side. The Supreme Court has recognized in numerous cases that nervous or evasive behavior "is a pertinent factor in determining reasonable suspicion." *Wardlow,* 528 U.S. at 124, 120 S.Ct. at 676. In the instant case, the police officers confronted Oglesby and the group of men he was standing with to discuss possible violations of two city ordinances. Oglesby was the only man in the group who seemed to be taking evasive action during the confrontation. There is nothing in the record to indicate any reason why a law-abiding person in Oglesby's position would have cause to be nervous or back away from the officers. In addition, the police officers testified at the suppression hearing that, based on their experience, Oglesby's behavior led them to

believe that Oglesby might be a flight risk. Such behavior, coupled with the other circumstances surrounding the *Terry* stop, would create a reasonable suspicion that Oglesby was carrying a gun or was otherwise engaged in unlawful activity.

Oglesby had also angled his body away from Officer Poynter and Officer Feathersone so that Oglesby's right side was obscured from their view. Officer Johnston testified at the suppression hearing that police officers are trained to use the same angled stance to shield their weapons when confronting a potentially dangerous subject. Thus, Officer Johnston's training made it reasonable for him to infer that Oglesby's stance was potentially calculated to keep a weapon hidden or out of reach.

Finally, Oglesby repeatedly lowered his right hand toward the right pocket of his pants. At the suppression hearing, Officer Poynter indicated that police officers are trained to watch for such behavior since experience has shown that a subject who pats his waistband may be trying to confirm that his gun is concealed and secured. Officer Featherstone indicated that he was worried when Oglesby dropped his right hand out of Officer Featherstone's view, which was why Officer Featherstone repeatedly asked Oglesby to show his hands. Officer Johnston stated that he perceived Officer Featherstone's alarm when Oglesby repeatedly lowered his right hand. Although there is some indication that Officer Featherstone had asked the group at one point to produce identification, the record also indicates that Oglesby placed his hand on his right side prior to the

request. Thus, the record clearly reflects that such action by Oglesby reasonably indicated to the officers that Oglesby might be carrying a weapon.

Based on the factors above and the totality of the circumstances, Officer Johnston clearly had articulable facts upon which he could reasonably suspect that Oglesby was armed or dangerous. Officer Johnston's timely and efficient observations in this case allowed him to discover the handgun Oglesby was carrying and remove it quickly and peacefully. Officer Johnston's ability to synthesize his observations and react quickly was vital to the safety of the officers and the public. It is clear that the circumstances of the encounter, in combination with Officer Johnston's experience and training, resulted in the proper pat-down search of Oglesby.

Furthermore, the pat-down search was extremely limited in scope. Oglesby's behavior led the officers to suspect that Oglesby might be carrying a weapon on the right side of his waistband area, and Officer Johnston's pat-down frisk of Oglesby was isolated to that area. Thus, Officer Johnston's pat-down frisk only minimally invaded Oglesby's personal security. In this case, the need of the police officers to protect themselves and the public from potential violence clearly outweighed the slight invasion to Oglesby's personal security. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578-79 (1975) (instructing the court to balance the public interest served by a search against the invasion of personal security when testing the reasonableness of the search). Therefore, based on all of the foregoing, we

conclude that Officer Johnston's pat-down frisk of Oglesby did not violate Oglesby's Fourth Amendment rights.

## III. Conclusion

For the above stated reasons, we AFFIRM the district court's denial of Oglesby's motion to suppress.