NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 14, 2012
Decided December 12, 2012

**Before**

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 12-1901

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Southern District of Illinois. |
| | |
| *v.* | No. 11 CR 40014 |
| | |
| PETRE D. WASHINGTON, | J. Phil Gilbert, |
| *Defendant-Appellant*. | *Judge.* |

**O R D E R**

Petre Washington pleaded guilty to unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). His plea was conditioned on his ability to appeal the district court's denial of his motion to suppress evidence of the gun that a police officer found during a pat-down search and that led to his conviction. On appeal Washington argues that the officer could not have reasonably suspected him of criminal activity at the time of the stop. Because the officer had reasonable suspicion to pat down Washington, we affirm the judgment.

In the early morning hours of October 24, 2010, Sergeant Anthony Williams and other uniformed officers of the Carbondale Police Department were on foot patrol at the corner of Grand Avenue and Wall Street in Carbondale, Illinois. The intersection is adjacent

to several bars that had just closed for the evening and the parking lots were filled with people. Due to the high volume of reports of fights, guns, disorderly conduct, and domestic batteries around those bars between midnight and 4:00 a.m., the department regularly assigns officers to patrol the area at that time. Several bars in the area also employ their own security staff.

At about 2:14 a.m. an unidentified man approached Sergeant Williams and reported that there was a man with a gun in an adjacent parking lot. The informant said that he saw the man pull a gun from under the hood of a parked car and tuck the gun into the front of his waistband. The informant, who wanted to remain anonymous, described the suspect as a large, but not obese, black man who was wearing a black jacket with a white t-shirt underneath. He described the car as purple, but noted that the paint changed colors depending on the light and angle from which it was viewed, and told Sergeant Williams that he "couldn't miss it."

The informant accompanied the officer to the parking lot. At the parking lot, the informant pointed out a 1978 Chevrolet that matched his earlier description. Sergeant Williams ran the license plate and determined that the car belonged to Petre Washington. The informant said that he did not see the suspect in the parking lot and then left.

After asking a nearby security guard to watch the car, Sergeant Williams approached two black men who were standing nearby; one was wearing a black jacket and the other was wearing a black shirt. They were tall, but obese. Both denied owning the car or carrying a gun. Sergeant Williams conducted consensual pat-down searches on both men confirming that neither had a gun. The officer then saw what he believed to be a black jacket laying in the back seat of the Chevrolet. (The item turned out to be a gray sweatshirt.)

Sergeant Williams noticed the man later identified as Washington standing near the door of a bar; he was "looking intently" at the officer and was "one of the only people in the crowd that was paying any attention" to him. Washington, a black man, is approximately 6'4" tall, weighs about 270 lbs, and was wearing a white t-shirt. The security guard told Sergeant Williams that he had been told to "watch out" for Washington.

Sergeant Williams held eye contact with Washington and started to walk in his direction. Washington immediately turned and walked behind the building. Sergeant Williams alerted two other officers that he was following a man who matched the informant's description. As the officers rounded the corner of the building, they saw Washington look back over his shoulder at them and then quicken his pace. Sergeant Williams called for Washington to stop and he complied, but he seemed "very nervous." Sergeant Williams asked if Washington owned the Chevrolet, and he did not respond.

Sergeant Williams then asked if Washington was carrying a gun; he said no but his eyes dropped immediately to the front left side of his waistband.

Sergeant Williams told Washington that he was going to pat him down for weapons and grabbed his right wrist (in case he had a gun). Officer Adam Boyd then placed his hand on the left area of Washington's front waistband—where Washington had looked—and felt the grip of a handgun. Washington immediately began to run. Officer Boyd pulled the gun from Washington's waistband and Sergeant Williams held on to Washington as he ran, forcing him to the ground.

A grand jury charged Washington with one count of unlawful possession of a firearm by a felon. *See* 18 U.S.C. § 922(g)(1). Washington filed a motion to suppress evidence of the gun, arguing that Sergeant Williams did not have reasonable suspicion of criminality because (1) the anonymous tip was not reliable, (2) the vague description of the suspect applied to a large number of black men engaged in lawful conduct, and (3) his behavior was insufficient to give rise to reasonable suspicion.

After a hearing, the district court denied the motion to suppress the evidence. The court concluded that Sergeant Williams had reasonable suspicion because the incident took place in a high-crime area, he believed the eyewitness's tip to be credible, and Washington met the informant's description. The court also considered Washington's suspicious behavior: he stared intently at Sergeant Williams while Williams looked in the car, walked away after the officer made eye contact with him, and looked back and quickened his pace when he saw the officers following him. He appeared nervous, and glanced toward his waistband when Sergeant Williams asked if he had a gun. With these facts, the court concluded that the totality of the circumstances supported the pat-down search.

On December 2, 2011, Washington entered a conditional guilty plea under Federal Rule of Criminal Procedure 11(a)(2). The district court calculated a guidelines range of 130 to 162 months' imprisonment, based on a total offense level of 27 and a criminal-history category of 6. The court sentenced Washington to the statutory maximum of 120 months' imprisonment, *see* 18 U.S.C. § 924(a)(2), with credit for 8 months served on a revocation charge, for a total of 112 months.

On appeal Washington argues that the district court erred in denying his motion to suppress because Sergeant Williams did not have reasonable suspicion that he was engaged in criminal activity at the time of the investigatory stop. A police officer may conduct a brief, investigatory stop of an individual—also known as a *Terry* stop—if the officer has reasonable, articulable suspicion that the individual has committed or is about to commit a crime. *See Terry v. Ohio*, 392 U.S. 1, 21–22 (1968); *United States v. Booker*, 579 F.3d

835, 838 (7th Cir. 2009). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006); *see United States v. Hicks*, 531 F.3d 555, 558 (7th Cir. 2008). Even if certain behavior in isolation may have an innocent explanation, that same behavior may contribute to a determination of reasonable suspicion when viewed in the context of the totality of the circumstances. *Lawshea*, 461 F.3d at 859; *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005).

Here the totality of the circumstances gave Sergeant Williams reasonable suspicion to pat down Washington. First, when Sergeant Williams noticed Washington staring intently at him, the security guard of a nearby bar informed him that his staff had been told to "watch out" for Washington. Second, as a large, not obese, black man wearing a white t-shirt, he matched the informant's description. Third, the officers determined that Washington retreated from them and acted nervously before the pat-down search, and "nervous or evasive behavior 'is a pertinent factor in determining reasonable suspicion.'" *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Fourth, the pat-down search occurred at a location that the officers knew was a high-crime area. *See Oglesby*, 597 F.3d at 894; *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002). Violent altercations and other disturbances were so common at the bars surrounding Grand Avenue and Wall Street that the police department regularly sent officers—wearing bulletproof vests—to patrol the parking lots. (In fact, gunshots had been fired at one of the bars less than three weeks earlier.)

Finally, the officers testified that, in their experience, Washington exhibited behavior that created a reasonable suspicion that he was engaged in unlawful activity. *See United States v. Arvizu*, 534 U.S. 266, 273–74 (2002); *Oglesby*, 597 F.3d at 894; *Baskin*, 401 F.3d at 791. The officers saw Washington look back over his shoulder at them and then quicken his pace; they determined, based on their experience, that Washington was checking to see if they were following him. And when they stopped Washington and asked if he was carrying a gun, his eyes dropped immediately to the front left side of his waistband. Officer Boyd testified that, in his experience, when an individual is asked whether he has a gun and quickly glances at an area of his waistband, he may be carrying a gun in that area of his waistband. And he looked exactly where the informant placed the gun.

Washington argues, relying on *Florida v. J.L.,* 529 U.S. 266 (2000)*,* and *Alabama v. White*, 496 U.S. 325 (1990), that the "anonymous, uncorroborated" tip was unreliable because Sergeant Williams failed to ask follow-up questions or to obtain the informant's name. Depending on the circumstances, an anonymous tip with some corroboration may provide reasonable suspicion for a *Terry* stop. *See J.L.*, 529 U.S. at 270; *White*, 496 U.S. at 329;

*United States v. Wooden*, 551 F.3d 647, 649 (7th Cir. 2008); *Hicks*, 531 F.3d at 558–60. But unlike the informants in *J.L.* and *White*, this informant was not an anonymous caller; he was an eyewitness who told the officer, face-to-face, that he observed the suspect take the gun from the hood of the car and place it in his waistband. *See Wooden*, 551 F.3d at 649–50 (concluding that a report by anonymous person claiming to have seen a gun drawn in public provided articulable suspicion). The eyewitness then accompanied the officer to the parking lot to identify the car. Sergeant Williams testified that the eyewitness did not appear intoxicated or otherwise impaired. And because the eyewitness reported an ongoing crime in a high-crime area (Illinois prohibits the carrying of concealed weapons, *see* 720 ILCS 5/24-1(a)(4)), action with fewer procedural checks in advance was reasonable. *See Wooden*, 551 F.3d at 650.

Washington also argues that the officers illegally stopped and searched him based solely on his race. We agree with the district court that this argument is without merit. Race was but one factor the informant used to describe the suspect, and there were myriad circumstances supporting Sergeant Williams' suspicion that Washington was the suspect. And although Washington argues that he did not meet the informant's physical description because he was not wearing a black jacket, Sergeant Williams testified that after seeing what he thought was a black jacket in the car, he thought that the suspect would be wearing only the white t-shirt. Washington fit that description. Under these circumstances, it was only reasonable, even necessary, to locate a person who retrieved a hidden gun, placed it in his waistband and proceeded to enter a crowded location that was predetermined to be a dangerous place that required substantial police and private security.

**AFFIRMED**.