# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-3215

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

KENNETH BARNETT,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 CR 10012—**Michael M. Mihm**, *Judge.*

ARGUED JANUARY 18, 2007—DECIDED OCTOBER 2, 2007

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Kenneth Barnett successfully moved to exclude evidence of a handgun found on his person when he was frisked by police during a *Terry* stop. The district court granted his motion after determining that the police did not have a reasonable suspicion that Barnett might be armed during the stop—thus the frisk was not reasonable even though the stop itself was. We find that the police had adequate, reasonable suspicion that Barnett could be armed, and that the frisk for weapons was a constitutionally valid search. We reverse and remand.

During the suppression hearing and two supplemental hearings with additional evidence, the district court was

presented with the following facts. Officers Parnell and Sinks were on patrol in Peoria, Illinois in January 2006 when they spotted Barnett alone in a dark, empty parking lot near some businesses that were either closed or preparing to close. The officers noted that Barnett appeared "nervous, startled" and "hurried" when they slowly approached in their squad car. The officers decided to stop Barnett out of suspicion that he may have robbed a closed and darkened restaurant bordering the parking lot, even though there was no police report to that effect. The district court determined that this constituted a valid *Terry* stop supported by reasonable suspicion, and Barnett does not challenge that ruling. The contest between the parties involves the officers' interaction with Barnett after they initiated the stop but prior to the frisk that uncovered the gun.

Officer Sinks approached Barnett while Officer Parnell stood a few feet away. Sinks asked Barnett why he was in the area, and Barnett replied that he worked at the restaurant, which he had just closed for the evening, and he was going home. He provided a local address as his destination. The officers observed, however, that Barnett was nervous and sweating profusely despite the 30-degree temperature. Sinks asked for his identification. The officers testified that as Barnett turned to retrieve his identification from a pocket they saw the outline of the butt of a gun protruding through the waist area of the sweat suit Barnett was wearing. The officers recalled that his sweat suit was gold in color and of a "velvet type" material, and that it was no more loose-fitting than an ordinary sweat suit. Sinks admitted that until he saw what he took to be the outline of a gun, he did not believe Barnett was armed.

Officer Sinks examined Barnett's identification and noted that it listed an address roughly 40 miles away, contradicting Barnett's statement that he was going home

to a local address. Sinks inquired several times if Barnett had anything illegal and if he would allow Sinks to frisk him for the officers' safety. Barnett responded that he did not want to be frisked and that his lawyer told him not to let officers frisk him. At some unspecified time during this roughly five-minute exchange, the officers had called for backup, which now arrived at the scene. With a third officer present, the officers immediately told Barnett they "had to" frisk him, and they grabbed his arm. Barnett then said, "Yeah, I got a gun on me." The officers discovered a loaded handgun in his waistband. Barnett's recollection of the events differed slightly: he testified that the officers asked to search him even before examining his identification; that he already had his identification out and did not reach into his pocket to retrieve it; and that after seeing his identification, Sinks said, "I don't mind about the drugs that you have on you, but where's the pistol," and then additional officers appeared and grabbed him.

Barnett appeared before the district court wearing a sweat suit that jail personnel certified had been collected from him at the time of his arrest, though officers Parnell and Sinks claimed that the sweat suit was larger and of a different color than they remembered Barnett wearing that night. Barnett explained that he had borrowed the sweat suit from his 400-pound cousin. The court noted that the sweat suit was "grossly" oversized for Barnett, who weighed 200 pounds.

After the court observed Barnett wearing the sweat suit with the unloaded gun in his waistband (in different variations of a zipped and unzipped top and tucked and untucked tee shirt, according to the different memories of Barnett and the officers), it determined that the government had not established by a preponderance of the evidence that the officers saw a gun protruding through Barnett's sweat suit. The court considered that Barnett

lost approximately 35 pounds since the night of his arrest, but concluded that, even allowing for the weight loss, the sweat suit was too baggy to have allowed the officers to have seen a gun tucked in his waistband.

The court noted that the officers' frisk of Barnett would be constitutional if, under *Terry*, they had reasonable suspicion that he was armed and dangerous. But having discounted the testimony that the police saw the protrusion of the gun, the court concluded that the officers did not subjectively believe Barnett was armed or that they were in danger. It noted that Sinks specifically stated that he did not think Barnett was armed until he saw the outline of a gun, and it focused on the officers' agreement that Barnett was "cordial," "cooperative," "respectful," and "non-threatening." Without the officers' subjective suspicion of danger, the court explained, even a justified *Terry* stop did not warrant a frisk for weapons. The court also orally discussed the elapsed five minutes prior to the frisk, noting that if the officers had been concerned about Barnett being armed, they would have searched him immediately. The court even noted that an immediate frisk might have been reasonable, but that the delay of the officers showed that they merely wanted to search Barnett without having any true safety concern.

The court went on to consider whether Barnett's statement that "Yeah, I got a gun on me" constituted probable cause for the police to search him. It determined, however, that Barnett only made the statement once it was clear that the police were going to search him regardless, and as a result the statement was coerced and involuntary. Thus it could not be a basis for probable cause.

The district court granted Barnett's motion to exclude the evidence of the gun. The government appeals that ruling, arguing that the frisk was justified because the officers had initiated a valid *Terry* stop based on suspicion

that Barnett was involved in a robbery, a crime so closely associated with weapon possession that his possible commission of such a crime created a reasonable suspicion that he was armed. We review the court's legal conclusions de novo and its findings of fact for clear error. *United States v. Riley*, 493 F.3d 803, 808 (7th Cir. 2007).

The district court erred in treating the test for reasonable suspicion as a subjective inquiry when it is an objective one. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) ("the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"); *Scott v. United States*, 436 U.S. 128, 137 (1978) (recognizing that "it is imperative that the facts be judged against an objective standard," "without regard to the underlying intent or motivation of the officers involved," and "the fact that the officer does not have the state of mind hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action"); *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("The Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent," because "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer"); *United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999) ("the test is objective, not subjective") (citing *Terry*, 392 U.S. at 27).

The frisk of Barnett was objectively reasonable. Though not every *Terry* stop justifies a frisk, some crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be

involved in such a crime. *See Terry*, 392 U.S. at 33 (Harlan, J., concurring) ("the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence"); *United States v. Hanlon*, 401 F.3d 926, 929-30 (8th Cir. 2005) ("when officers encounter suspected car thieves, they also may reasonably suspect the individuals might possess weapons"); *United States v. Edwards*, 53 F.3d 616, 618 (3d Cir 1995) (fraud that occurred in a bank during daytime made it reasonable to conclude suspects might have armed themselves and might use force to facilitate their escape); *United States v. Walker*, 924 F.2d 1, 4 (1st Cir. 1991) (an officer's "experience that burglars often carry weapons or other dangerous objects . . . clearly support[s] [his] concern for his safety and suspicions that [the suspects] might be armed"). Here, the parties agree that the officers had reasonable suspicion that Barnett might have been involved in a burglary, a crime normally and reasonably expected to involve a weapon. *Cf. United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004) ("Certainly a bank robbery is the type of violent criminal activity from which officers reasonably could infer that the suspect might be armed").

This objectively reasonable suspicion did not dissipate during the roughly five minutes of questioning leading up to the frisk, regardless of Barnett's "cordiality" or "cooperativeness." The officers' ongoing reasonable suspicion that Barnett committed a crime that likely involved a weapon independently preserved the justification for a protective frisk. This is true even if Officers Sinks and Parnell did not subjectively fear Barnett was armed when they announced that they intended to frisk him, because the legitimacy of their search stemmed at all times from whether a protective frisk for weapons was objectively reasonable under the circumstances. *See United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (noting that

the test for reasonableness is objective and thus rejecting defendant's argument that the passage of time prior to a frisk during a *Terry* stop showed that the officers did not subjectively believe he was armed); *United States v. Brown* 232 F.3d 589, 594-95 (7th Cir. 2000) (applying an objectiveness standard to uphold a frisk during a *Terry* stop when the defendant argued the officer did not subjectively fear for his safety). The testimony showing Barnett's high degree of nervousness and indirectness about his address and destination kept the suspicion of his involvement in a robbery alive during the questioning. As long as that suspicion remained alive, the objectively reasonable suspicion that he was armed remained alive. We would have a different case if the officers' questioning had dispelled objectively reasonable suspicion of his commission of a crime that often involves weapons, but that is not the case before us.

We note that the result of the district court's reasoning would be an incentive for police conducting a *Terry* stop to immediately frisk any person whom they think they may eventually need to frisk for their safety. This is not a desirable result. Officers may need to conduct some investigation to assess the situation and apprise themselves of the suspect's behavior and attitude before taking further action. Such investigation might even eliminate objective safety concerns and thus eliminate the personal intrusion of a frisk that otherwise might have occurred.

We also note that this was not a case of excessive delay prior to the frisk. Although the five-minute delay here calls into question the subjective intent of the officers and their fear of harm, it is not enough to call into question the objectively reasonable concern that a person still suspected of involvement in a crime in which he or she is likely to be armed might be carrying a weapon. A longer delay might eventually begin to undermine the objective reasonableness of a frisk. Such a case is not before us now.

Because the officers were justified in their frisk of Barnett under *Terry*, we need not address the question of the voluntariness of Barnett's admission to the officers that he possessed a gun.

For the foregoing reasons, the decision of the district court is REVERSED and REMANDED for continued proceedings not in conflict with this decision.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*