In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2031

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERNEST R. SNOW,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 09 CR 87—**Larry J. McKinney**, *Judge*.

ARGUED FEBRUARY 7, 2011—DECIDED AUGUST 24, 2011

Before ROVNER and WOOD, *Circuit Judges*, and
GOTTSCHALL, *District Judge*.[*]

ROVNER, *Circuit Judge*. A gun was discovered on
Ernest R. Snow's person after he was pulled over on
suspicion of a burglary attempt and ordered out of his
vehicle for a protective patdown. *See Terry v. Ohio*, 392

---

[*] The Honorable Joan B. Gottschall, of the Northern District
of Illinois, sitting by designation.

U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968). As Snow had prior felony convictions, he was indicted pursuant to the felon-in-possession statute, 18 U.S.C. § 922(g)(1), and ultimately pleaded guilty to that charge. Snow contends, however, that his motion to suppress evidence related to the gun should have been granted, because the police officers who stopped him lacked any reasonable grounds on which to believe that he might be armed and that the order to exit his vehicle for purposes of a protective frisk was therefore invalid. We disagree and affirm.

## I.

Shortly before 4 p.m. on January 16, 2009, a 911 operator dispatched members of the Indianapolis police to a residential address after receiving a call reporting an attempted break-in at that address. The dispatcher advised the officers that there was a "burglary in progress" and that the suspect was "a person [of] unknown racial description in a black hoodie, gray pants, trying to crawl through the front window, now went around back." R. 60-1 at 2.

After making the dispatch, the 911 operator resumed contact with the caller, whom she had placed on hold. At the operator's request, the caller described the house (which was across the street from the caller); the caller also noted that there was a pickup truck parked in front of the house that was green in front and white in back. The caller then revised her description of the suspect, whom she now spotted on the side of the residence, as

dressed in loose-fitting jeans rather than gray pants. The operator passed all of this information along to the officers, although she inaccurately described the truck as being green and black. Finally, the caller reported that the man had returned to the front of the house, appeared for a moment to be holding and possibly texting with a cell phone, and then entered the truck and drove off. When the operator reported these events to the police, one of the officers immediately responded that he had spotted the truck approximately two blocks from the residence. The truck, which the officers later testified was multicolored, or green in front and a different, unspecified color in back, was stopped shortly thereafter by officer Nicholas Andrews.

Snow was at the wheel of the truck. As Andrews approached the driver's side of the vehicle, he observed that Snow was dressed in a black hooded sweatshirt and baggy blue jeans. Andrews asked Snow for his driver's license, which Snow handed to him. Apparently without being asked, Snow also removed his keys from the ignition and handed them to Andrews. At about this time, the two other officers who were responding to the dispatch arrived on the scene.

Andrews would later testify that without asking Snow any questions or conducting any further investigation, he ordered Snow to step out of the truck with the intent to frisk Snow for weapons. Andrews explained that he gave that order "for officer safety," because he "believed [Snow] was a burglary suspect." R. 56 at 16. Snow alighted from the vehicle as directed, but when

Andrews instructed him to place his hands on the truck for purposes of the patdown, Snow instead spun around to face the officer. Interpreting this as an act of aggression, Andrews grabbed Snow's left arm, forced it behind his back, pinned him against the truck, and ordered him to "stop resisting." R. 56 at 17. The other officers, on seeing what was happening, ran to Andrews' aide. Officer Michael Wolley grabbed Snow's right arm, which Snow was moving toward his waist. At this point, officer Emily Perkins spotted the handle of a gun in Snow's waistband. She called out "gun" and seized the firearm. Snow was taken into custody.

Snow was never charged with attempted burglary (although there is no dispute that he was the person seen by the 911 caller) but he was, as we have noted, charged with being a felon in possession of a firearm. He moved to suppress all evidence related to the gun, contending that the police lacked a reasonable basis to believe that he might be engaged in criminal activity, such that he could be stopped for investigatory purposes under *Terry* and, furthermore, that the officers lacked any grounds to believe that he might be armed, such that he could be frisked for weapons as part of the investigatory stop. Based on the information provided by the 911 call, the district judge concluded that the officers had reasonable grounds on which to believe that Snow may have attempted to commit a burglary and thus to detain him under *Terry*. The court did not separately consider whether the officers had grounds on which to believe that Snow might be armed, such that a protective patdown was in order.

While reserving his right to appeal the denial of his motion to suppress, Snow pleaded guilty to the felon-in-possession charge. Snow's status as an armed career criminal, *see* 18 U.S.C. § 924(e), mandated a prison term of not less than fifteen years. The district court ordered him to serve that minimum term.

## II.

Snow contends on appeal that the facts confronting the officers who stopped him did not support a reasonable suspicion that he might be armed, such that a protective patdown was authorized. This is a legal determination that we review de novo. *United States v. Richmond*, 641 F.3d 260, 262 (7th Cir. 2011). We of course owe deference to any pertinent findings of historical fact made by the district court. *E.g.*, *United States v. Tyler*, 512 F.3d 405, 409 (7th Cir. 2008).

*Terry* authorizes a brief investigatory detention of an individual whom the police reasonably suspect, based on specific and articulable facts, of engaging in criminal activity. 392 U.S. at 21-22, 30, 88 S. Ct. at 1880, 1884. "Reasonable suspicion is more than a hunch but less than probable cause and 'considerably less than preponderance of the evidence.'" *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675 (2000)). Whether it was reasonable for an officer to suspect that the defendant was engaged in wrongdoing calls for an objective inquiry into all of the circumstances known to the officer

at the time he stopped the defendant, including infor-
mation relayed to him by fellow officers and police dis-
patchers. *E.g., United States v. Hicks*, 531 F.3d 555, 558
(7th Cir. 2008); *United States v. Drake*, 456 F.3d 771, 774-
75 (7th Cir. 2006). Snow no longer disputes that facts
known to Andrews and the other officers gave rise to a
reasonable suspicion that he may have been involved in
criminal activity, such that an investigative detention
under *Terry* was warranted. However, he renews his
contention that the facts did not support the decision
to order him out of his truck and to place his hands on
the vehicle for a protective patdown, which order re-
sulted in the discovery of the gun underlying his con-
viction.[1]

---

[1] Throughout this opinion, we have assumed, consistent with
the premise of Snow's appeal and with the government's
primary argument in support of affirmance, that the process
of the frisk commenced when Andrews ordered Snow to step
out of the truck and to place his hands on the vehicle so that
he could be patted down. We have also assumed, in turn, that
a reasonable suspicion that Snow might be armed was re-
quired in order to justify Andrews' order, regardless of
whether and when Andrews touched Snow's person. However,
our recent opinion in *United States v. Tinnie*, 629 F.3d 749, 753
& n.3 (7th Cir. 2011) (2-1 decision), deemed a frisk not to
have begun until the officer actually placed his hands on the
defendant. In determining whether the officer reasonably
suspected that the defendant might be armed, the *Tinnie*
majority therefore looked at all of the information that
became known to the officer until that moment, including

(continued...)

*Terry* recognizes the authority of an officer conducting an investigatory stop to take reasonable steps to assure the safety of himself and others. Specifically, an officer may frisk a detained individual for weapons when the officer reasonably believes that the suspect may be armed and poses danger to the officer or others nearby. 392 U.S. at 27, 30-31, 88 S. Ct. at 1883, 1884-85. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man

---

[1] (...continued)
the defendant's answers to questions posed by the officer as the defendant was assuming the position for the patdown at the officer's command. *Id.* By contrast, Judge Hamilton's dissenting opinion contended that the majority had conceived of the frisk too narrowly, ignoring the real sense in which a person is seized when a police officer orders him to bend over the hood of a car or place his hands against a wall in preparation for a patdown. *Id.* at 759. An understanding that the frisk does not commence until the officer lays his hand on the defendant, and that no reasonable suspicion that the defendant poses a danger is required until that precise moment, would likely doom Snow's appeal, given that Snow spun around on Andrews, triggering the scuffle that led Officer Perkins to spot his gun, before Andrews could ever touch Snow. Indeed, the government makes a secondary argument more or less along these lines at the conclusion of its brief. Gov't Br. 14-15. However, because we conclude, for the reasons we discuss below, that Andrews did have a reasonable suspicion that Snow might be armed as of the moment Snow was stopped and ordered out of his truck for a patdown, we need not explore this alternative rationale.

in the circumstances would be warranted in the belief that his safety or that of others is in danger." *Id.* at 27, 88 S. Ct. at 1883. That assessment is made based on the totality of the circumstances. *E.g.*, *United States v. Robinson*, 615 F.3d 804, 807-08 (7th Cir. 2010).

When Andrews stopped Snow, neither he nor his fellow officers had any information, apart from his status as a burglary suspect, that Snow might pose a danger to the officers. The 911 caller had said nothing to the dispatcher suggesting that Snow might have a weapon or had behaved in a menacing fashion. Snow was neither speeding nor driving erratically when Andrews stopped him in traffic. When Andrews approached Snow, he did not observe any sign of a weapon underneath Snow's clothing. Snow was calm and cooperative when Andrews asked him for his driver's license. Nothing in the record suggests that the area in which Snow was stopped had a history of recent burglaries or was a high-crime neighborhood.

However, we held in *United States v. Barnett*, 505 F.3d 637, 640-41 (7th Cir. 2007), that a reasonable suspicion that someone has committed a burglary typically gives rise to a reasonable suspicion that the person might be armed. "Though not every *Terry* stop justifies a frisk, some crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime." *Id.* at 640. Because burglary is the type of offense "normally and reasonably expected to involve a weapon," we con-

cluded that police do not require additional information suggesting that a suspect might be armed before they may conduct a protective frisk of someone they reasonably suspect of being a burglar. *Id.*; *see also United States v. Bullock*, 510 F.3d 342, 347 (D.C. Cir. 2007). We added that a suspect's "cordiality" and "cooperativeness" upon being stopped for questioning do not undermine the possibility that he might be armed: "[the] officers' ongoing reasonable suspicion that [the suspect] committed a crime that likely involved a weapon independently preserve[s] the justification for a protective frisk." *Barnett*, 505 F.3d at 640.

Snow attempts to distinguish *Barnett* on the ground that Andrews and the other officers did not suspect him of burglary based on what they observed directly but rather based on uncorroborated information provided by a 911 caller and relayed to them by a dispatcher. He likens the case to *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375 (2000), which held that an anonymous telephone tip that a young man at a particular bus stop was carrying a gun did not supply police with reasonable suspicion to stop and frisk the youth, when the tip bore no indicia of reliability beyond its accurate description of the suspect and his location. This case is similar, Snow suggests, in that neither the 911 operator nor the police had any independent basis on which they could verify the accuracy of anything the caller reported other than her description of the suspect, what he was wearing, and what type of vehicle he was driving. Snow points out that had Andrews chosen to question Snow first, he might have developed information that confirmed the

substance of what the caller reported, but instead Andrews forewent any such inquiry and proceeded immediately with a patdown based solely on the 911 dispatch.

The fact that the officers were relying on information reported by a 911 caller and conveyed to them by the operator does not meaningfully distinguish this case from *Barnett*. In *Drake*, 456 F.3d at 774-75, we held that a 911 report of an ongoing emergency by an eyewitness is presumptively reliable, and that when the caller provides enough information to identify himself, the police are entitled to rely on the call in responding to the emergency. *See id.* at 774 ( "[The 911 caller] may have been an informant of untested reliability, but she was not anonymous. Thus, this case is not governed by *Florida v. J.L.*".); *Hicks*, 531 F.3d at 559 ("Courts, including our own, have distinguished *J.L.* when the tipster gives her name or other identifying information to the 911 operator.") (coll. cases). We have also noted that this principle applies to 911 calls reporting very recently completed crimes. *Id.*

In this case, the 911 call began as a report of an ongoing emergency. The 911 caller identified herself in the course of the call and provided her location—directly across the street from the residence in question. She described events as she was witnessing them, reporting initially that she had seen a man attempting to crawl through a front window, and later that the individual had gone around the back of the home and then emerged on the side of the house. There may have been an innocent explanation for the behavior described by

the caller, but a nefarious explanation was at least equally plausible; and given the potential danger posed to the property and its inhabitants by an unlawful entry, an immediate response by the police was warranted based solely on the information provided by the caller.

Evidently the man did not actually enter the residence. The caller ultimately reported that he left the scene in his truck after possibly sending a text message on a cell phone. But that report did not render the situation something other than an emergency. The fact that the man was leaving the scene did not rule out the possibility of his return and a renewed effort to enter the residence; and if he was using a cell phone to send a text message, it may have been one to an accomplice. Even if we discount these possibilities and assume that the man had given up trying to enter the house, this was, at the least, a very recently concluded (apparent) criminal attempt. Snow's truck was spotted and stopped within two blocks of the residence and within moments of the first dispatch to the officers. His truck and his clothing generally matched the description relayed by the dispatcher. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) ("[P]olice observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch.") (citing *United States v. Juvenile TK*, 134 F.3d 899, 904 (8th Cir. 1998)). Under these circumstances, Andrews was entitled to rely on the information relayed to him by the 911 dispatcher in making not only the decision to stop Snow for

investigative purposes, but also the decision to frisk him for weapons.

Now, it is true, as Snow points out, that the 911 caller never used the term "burglary"; that was a term that the dispatcher herself injected into her communications with the police officers. But "burglary" was nonetheless a reasonable label for the dispatcher to place on the events reported by the caller. The caller had described an apparent effort to enter a residence without authority. More than an illegal entry would be required to convict someone of burglary: Indiana law defines burglary as an unauthorized entry into a building or structure with the intent to commit a felony, Ind. Code § 35-43-2-1, and proof of an unauthorized entry by itself does not suffice to establish an intent to commit a felony. *See Freshwater v. State*, 853 N.E.2d 941, 943 (Ind. 2006) ("Intent to commit a felony may not be inferred from proof of breaking and entering alone.") (quoting *Justice v. State*, 530 N.E.2d 295, 297 (Ind. 1988)). In the context of a *Terry* stop, however, all that is required is reasonable suspicion that criminal activity may be afoot. 392 U.S. at 30, 88 S. Ct. at 1884. It was a fair inference based on the attempted entry described by the caller that the man she saw was attempting to burglarize a residence—that is, to gain entry for the purpose of committing a felony, including theft. *See, e.g., United States v. Davis*, 175 F. App'x 286, 288 (11th Cir. 2006) (nonprecedential decision) (among other facts, dispatch report that defendant had been seen crawling through window of trailer supported reasonable suspicion that he may have committed burglary). As we have dis-

cussed, that is certainly not the only explanation for the behavior observed by the caller, but it is a plausible and, indeed, likely explanation. Only by investigating the circumstances further, and in particular by questioning the individual the caller had seen, could the police determine whether in fact a burglary had been committed or attempted. And that is the very purpose of a *Terry* stop. 392 U.S. at 22-23, 88 S. Ct. at 1880-81.

Because the facts known to the officers supported a *Terry* stop to investigate whether he in fact had attempted a residential burglary, and because burglary is the type of offense that likely involves a weapon, Andrews' decision to order Snow out of the truck for purposes of a protective frisk was reasonable despite the absence of additional facts suggesting that Snow in particular might be armed. That Snow was calm and readily gave his driver's license to Andrews did not, for the same reasons we cited in *Barnett*, mitigate the reasonable suspicion that he might be armed given the nature of the crime of which he was suspected. Nor does the fact that Snow handed over his keys without being asked mitigate that suspicion. Viewed in a light favorable to Snow, the surrender of his keys was simply an additional manifestation of his cooperative attitude; although we add that it could also be viewed as an attempt to forestall any request that he step out of the truck. Snow points out that the stop did not occur at night or in a neighborhood that was known to have a high crime rate. *See, e.g.*, *United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011) (citing the time of day and nature of the neighborhood as among the circumstances sup-

porting a protective patdown). But given that it is the nature of the crime of which Snow was suspected that gave rise to the inference he might be armed, the time and place of the stop did not lessen the possibility that Snow might pose a danger to Andrews or others nearby. Moreover, given what Snow was wearing (loose-fitting jeans and a hooded sweatshirt), it was not possible for Andrews to determine just by looking at Snow whether a weapon might be concealed by his clothing. Finally, whatever Andrews potentially might have learned by questioning Snow further before deciding to pat him down is neither here nor there, given that it was reasonable to suspect that Snow was armed at the very outset of the stop. After all, the purpose of a protective frisk is to ensure the safety of the officer and others during the investigative detention. As our colleagues on the Fourth Circuit have observed:

> A compulsory interval of questioning between the stop and frisk leaves law enforcement officers at risk; "such a limitation would be unsound and has not been followed by the Supreme Court or the lower courts." W. LaFave & J. Israel, CRIMINAL PROCEDURE 182 (1985). "There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." *Terry*, 392 U.S. at 33, 98 S.Ct. at 1886 (Harlan, J., concurring).

*United States v. Moore*, 817 F.2d 1105, 1107-08 (4th Cir. 1987) (Wilkinson, J.).

### III.

Because the facts known to the police officers who stopped Snow supported a reasonable suspicion that he may have just attempted to commit a burglary, and because burglary is the type of crime that often involves a weapon, the officers had reasonable grounds on which to believe that Snow might be armed. Officer Andrews' order that Snow step out of his truck and submit to a protective patdown was therefore lawful, and the district court properly denied Snow's motion to suppress all evidence related to the gun that was discovered when Snow resisted the frisk. We thank Snow's appointed counsel for their vigorous advocacy on Snow's behalf.

AFFIRMED