TYMKOVICH, C.J., concurring in part and dissenting in part.
I would affirm the district court's decision. I would hold that Officer Dollar had reasonable suspicion Romero was armed and dangerous and could therefore perform a protective pat-down search of Romero's outer clothing. Officer Dollar had reasonable suspicion of burglary and observed a knife clip at Romero's hip, which constitutes more than sufficient facts to satisfy the Terry standard.
I would also hold that Officer Dollar had probable cause to arrest Romero for resisting. Romero did not comply with multiple orders from Officer Dollar until the officer threatened to tase him-and even then did not comply fully with perfectly reasonable commands. We cannot require more than do the New Mexico courts, and Romero's actions prove sufficient to support probable cause under a recent decision from the New Mexico Court of Appeals. See New Mexico v. Jimenez , 392 P.3d 668 (N.M. Ct. App. 2017).
I. Protective Frisk
The majority assumes without deciding that Officer Dollar had reasonable suspicion to perform a protective frisk. Because I would not reverse the district court's probable cause determination regarding Romero's arrest, I would reach the Terry frisk issue and hold that Officer Dollar reasonably ordered Romero to submit to a pat-down search of his outer clothing. I would clarify that even if the officer were investigating mere vandalism or theft, as Officer Dollar testified, he could have reasonably suspected Romero was dangerous. I also stress that we should not consider the requirements of a protective frisk-that (1) criminal activity be afoot and (2) the individual be armed and (3) dangerous-in a vacuum and as wholly independent elements. Each element informs and reinforces the others.
Romero conceded below that Officer Dollar initially had reasonable suspicion to investigate him for burglary. The district court relied heavily on that fact. The court reasoned that burglary is the "type of offense[ ] that would support reasonable suspicion that person may be armed and dangerous" because "burglary is 'a crime normally and reasonably expected to involve a weapon.' " United States v. Romero , Cr. No. 17-2190, 2018 WL 1896551, at *6 (D. N.M. Apr. 19, 2018) (citing United States v. Barnett , 505 F.3d 637, 640 (7th Cir. 2007).
Then Romero changed course before us at oral argument, noting that Officer Dollar never asserted he was investigating Romero for burglary. The officer knew only that churches in the area had been vandalized and items stolen, so he had questioned Romero on suspicion of vandalism *1133 or theft. Oral Arg. at 3:50-4:10. The United States, according to Romero's counsel, inserted suspicion of burglary into the proceedings, and the district court accepted that characterization. Id. Romero then proclaimed to us that suspicion of vandalism or theft cannot, without independent evidence of the suspect's dangerousness, result in reasonable suspicion that a person is armed and dangerous.
Romero forfeited his challenge to the district court's determination that Officer Dollar had reasonable suspicion to investigate Romero for burglary by conceding that argument below and in the briefing before this court. But Romero continues to maintain that even if Officer Dollar had reason to suspect him of burglary the officer did not have reasonable suspicion to frisk him for weapons because Officer Dollar had no evidence Romero was dangerous. The officer merely suspected him of burglary and observed a knife clip.
Yet both of Romero's arguments misapply Supreme Court case law in the area. We do not analyze dangerousness separately from suspicion of criminality and possession of a weapon. And officers do not need to be investigating a violence-prone crime for a presumption of dangerousness to arise.
The analysis is governed by Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In Terry , the Court laid out the primary justification for protective pat-down searches, noting "we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." Id. at 24, 88 S.Ct. 1868. The Court therefore held when an officer reasonably "conclude[s] in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," the officer "is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id. at 30, 88 S.Ct. 1868.
We need look no further than the facts of Terry and later Supreme Court cases to determine what constitutes reasonable suspicion that an individual suspected of criminal activity is armed and dangerous. The Terry Court upheld a protective pat-down when a police officer observed two men suspiciously peering into the windows of several businesses. In light of his experience, the officer suspected the men of planning a robbery. He frisked the men upon receiving only mumbled responses to his initial inquiries. Id. at 6-7, 88 S.Ct. 1868. Importantly for our purposes, beyond the men's suspicious actions the officer pointed to no specific evidence that these men were armed or dangerous. Id. And yet the Supreme Court upheld the frisk. The reasoning of the Court was simply that since robberies often "involve the use of weapons," reasonable suspicion the suspects might engage in a robbery also yielded reasonable suspicion those men were armed and dangerous. Id. at 28, 88 S.Ct. 1868 ; see also Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.2(a) (5th ed. 2018) (courts "view the right to frisk as being 'automatic' whenever the suspect has been stopped upon the suspicion ... [of] a type of crime for which the offender would likely be armed").
Thus, one reading of Terry could require officers to be investigating a potentially violent crime-or observe some other indicia of dangerousness-before concluding a suspect is dangerous. But the Supreme Court has flatly rejected such a cabined reading. Over the course of the next two decades, the Court upheld two Terry frisks where police were investigating non-violent or routine matters.
*1134 The Court first decided a case where "officers stopped [a] vehicle for the purpose of issuing a traffic summons." Pennsylvania v. Mimms , 434 U.S. 106, 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Rather than stand on the side of the road in traffic, one of the officers ordered the driver to exit his vehicle. When the driver stepped out, the officer observed a large bulge under the man's sports jacket. The officer proceeded to frisk the man and discovered a loaded .38-caliber revolver. The driver challenged his conviction for illegally carrying a concealed firearm, and the Supreme Court rejected his contention that the officer lacked reasonable suspicion to frisk him for weapons-noting "there is little question the officer was justified." Id. at 111-12, 98 S.Ct. 330.
Later the Court upheld a frisk when officers stopped to investigate a vehicle that had swerved into a ditch. Michigan v. Long , 463 U.S. 1032, 1035, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The officers noted the driver "appeared to be under the influence of something" and requested he provide his vehicle registration. When the driver approached his vehicle to fetch the document, both officers "observed a large hunting knife on the floorboard of the driver's side of the car. The officers then stopped Long's progress and subjected him to a Terry protective pat-down." Id. at 1036, 103 S.Ct. 3469. The Court upheld the search for weapons on his person-and in the vehicle-because the hunting knife gave officers reasonable suspicion the man was armed and dangerous. Id. at 1051-53, 103 S.Ct. 3469. The Court "stress[ed] that a Terry investigation, such as the one that occurred here, involves a police investigation 'at close range,' when the officer remains particularly vulnerable"- such that an "officer must make a 'quick decision as to how to protect himself and others from possible danger.' " Id. at 1052, 103 S.Ct. 3469 (citing Terry , 392 U.S. at 24, 28, 88 S.Ct. 1868 ) (internal citations omitted).
The combined teaching of these cases is, first, police must have reasonable suspicion that "criminal activity may be afoot." Terry , 392 U.S. at 30, 88 S.Ct. 1868. Nothing substitutes for reasonable suspicion of criminal activity, since frisking a person based on a suspicion-or even a knowledge-that an individual is armed, "without more, serves to erode the precious protections of the Second and Fourth Amendments." See United States v. House , 463 Fed. App'x 783, 789 (10th Cir. 2012) ; see also LaFave, Search and Seizure § 9.2(a) (an officer may not frisk a pedestrian who is not engaged in suspicious conduct even if that officer "sees a suspicious bulge which possibly could be a gun").
Second, police need not be investigating a potentially violent crime, or one typically involving weapons, to develop reasonable suspicion that a person may be presently dangerous. The Supreme Court in Mimms and Long held that officers could perform a protective pat-down despite the non-violent or routine nature of the crimes for which the officers were investigating the suspects. But the cases also suggest that when investigating routine, non-violent crimes, police must point to specific and articulable facts suggesting the suspect is armed or otherwise dangerous.
And third, we do not analyze the Terry prongs wholly independently and in a vacuum. When officers have reasonable suspicion a suspect is armed-even when investigating routine or non-violent crimes-those same facts may give rise to reasonable suspicion the suspect is presently dangerous. This is explicit in Mimms . The Court stated simply, "The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer." 434 U.S. at 112, 98 S.Ct. 330 *1135 (emphasis added); United States v. Garcia , 751 F.3d 1139, 1143 n.7 (10th Cir. 2014) (noting that "an officer's suspicion that an individual is dangerous can affect that officer's suspicion that an individual is armed, and vice versa").
The officers in Mimms and Long presented no evidence beyond reasonable suspicion of criminal activity and of the suspect being armed to conclude the suspect might be dangerous. The officers did not know the suspects' criminal history. They did not observe any violent behavior. They were investigating crimes that typically do not involve weapons. The officers simply observed a weapon or a suspicious bulge and, in the course of their investigation, made a "quick decision as to how to protect [themselves] and others from possible danger." Long , 463 U.S. at 1052, 103 S.Ct. 3469 (emphasis added). Indeed, the en banc Fourth Circuit recently came to a similar conclusion, treating "armed and dangerous" as a unitary concept and reasoning that Mimms , by using " 'and thus' recognizes that the risk of danger is created simply because the person, who was forcibly stopped, is armed." United States v. Robinson , 846 F.3d 694, 700 (4th Cir. 2017) (en banc).
These quick decisions certainly will result in officers frisking many individuals who are not in any way dangerous to officers on the scene. But the reasonable suspicion standard allows for just such a result. Reasonable suspicion, after all, "is not, and is not meant to be, an onerous standard." United States v. Petit , 785 F.3d 1374, 1379 (10th Cir. 2015). Indeed, the reasonable suspicion standard allows police actions, such as a Terry frisk, "even if it is more likely than not that the individual" is not dangerous to officers or others. See id . (citing United States v. Johnson , 364 F.3d 1185, 1194 (10th Cir. 2004) ).
The Fourth Amendment's prohibition against unreasonable searches and seizures, therefore, entitles an officer to frisk a potentially armed suspect for weapons, regardless of the nature of the investigation, because a Terry stop "involves a police investigation 'at close range.' " Long , 463 U.S. at 1052, 103 S.Ct. 3469 (citing Terry , 392 U.S. at 24, 88 S.Ct. 1868 ). And what begins as a routine matter may quickly devolve into a more serious matter. Cf. Arizona v. Johnson , 555 U.S. 323, 331, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) ("[T]he risk of a violent encounter in a traffic-stop setting" stems from "the fact that evidence of a more serious crime might be uncovered during the stop." (citation and internal quotation mark omitted)); Mimms , 434 U.S. at 110, 98 S.Ct. 330 ("[A] significant percentage of murders of police officers occurs when the officers are making traffic stops.' " (citing United States v. Robinson , 414 U.S. 218, 234 n.5, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ). Thus, the Supreme Court has not "required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a Terry encounter." Long , 463 U.S. at 1052, 103 S.Ct. 3469.
Officer Dollar did not offend these principles when he attempted to frisk Romero for weapons. This remains true even if Officer Dollar was investigating mere vandalism or theft at the church. The officer observed Romero peering through the window of a church when no church services were being held, and Officer Dollar was aware of recent reports of vandalism and theft at nearby churches. The officer undoubtedly had reasonable suspicion to investigate further. And when, as the district court found, Officer Dollar approached Romero, he "saw what looked like a knife pocket clip on Mr. Romero's hip and a bulge on Mr. Romero's arm that could have been a knife." Romero , 2018 WL 1896551, at *5. When the officer asked Romero whether he had a weapon, Romero responded, "No, I got a ..."-while *1136 simultaneously reaching for his pocket where Officer Dollar had seen the knife clip. Id. Unsurprisingly, Officer Dollar "interpreted Mr. Romero's movement as a response to the question about weapons." Id.
Romero's response and actions certainly provided the officer reasonable suspicion Romero "was armed and thus posed a serious and present danger to the safety of the officer." Mimms , 434 U.S. at 112, 98 S.Ct. 330. As this court recently stated, "a visible and suspicious 'bulge' in a driver's pocket may alone 'permit[ ] the officer to conclude" a suspect is armed and dangerous. United States v. Gurule , 18-4309, --- F.3d ----, 2019 WL 4126533, at *6 (10th Cir. July 11, 2019) (quoting Mimms , 434 U.S. at 112, 98 S.Ct. 330 ) (emphasis added). This would undoubtedly extend to seeing a knife clip attached to a suspect's belt and a suspicious bulge on his arm that could have been an additional knife.
I would therefore conclude Officer Dollar had reasonable suspicion to perform a protective pat-down search of Romero's outer clothing.
II. Resisting Arrest
The majority also concludes Romero did not resist a peace officer within the meaning of N.M. Stat. § 30-22-1(D) because his conduct was insufficiently evasive. But the New Mexico Court of Appeals has defined the offense in broader terms than the majority concludes. See Jimenez , 392 P.3d at 668.
In Jimenez , the defendant resisted officer commands when he holed up in a club with a gun and told police he wanted them to shoot him. A SWAT team eventually apprehended Jimenez, and he was charged with "evading" an officer under § 30-22-1(B). Id. at 673-74. The court contrasted subsection (B) criminalizing "evading," under which Jimenez was charged, with subsection (D) prohibiting "resisting." The court noted that subsection (B) contained "language indicative of action" whereas subsection (D) contemplated occasions "when the subject is non-compliant." Id. at 678.
While the court was primarily interpreting subsection (B), it nonetheless concluded that resisting under subsection (D) "refers not only to a defendant's overt physical act, but also to the failure to act when refusing to obey lawful police commands." Id. at 682. In its final characterization of the subsection, the court concluded that "a defendant who is effectively 'cornered,' i.e., whose apprehension is imminent, but who nonetheless, chooses to challenge or forestall his arrest-either by physical battery, refusing to comply with orders, or verbally-violates Subsection (D)." Id. (emphasis added). This would certainly extend to a brief seizure for purposes of a pat-down, as subsection (D) does not limit resisting to situations of arrest.
Our inquiry should therefore focus on whether Romero's failure to act when Officer Dollar ordered him to (1) put down his phone and water bottle, and (2) put his hands on the wall rises to the level of attempting "to challenge or forestall" his impending pat-down by "refusing to comply with orders." See id. After watching the body-camera footage, I conclude Officer Dollar had sufficient "facts and circumstances within [his] knowledge ... to warrant the officer to believe" Romero had committed a crime. See New Mexico v. Granillo-Macias , 143 N.M. 455, 176 P.3d 1187, 189 (N.M. Ct. App. 2007) (setting out the probable cause standard for an arrest).[1]
*1137 Officer Dollar initiated the encounter in a friendly manner, but the situation quickly escalated. After the officer saw Romero's knife clip, he stated calmly, "Set that down," referring to the cell phone and water bottle Romero held, "Let me pat you down real quick." Romero , 2018 WL 1896551, at *2. Romero immediately protested, complaining "Oh, man. Why?" id. , while simultaneously turning his back on Officer Dollar and taking several steps away from him. Romero did not put down his phone or water bottle. The officer then quickly-and likely unnecessarily-escalated the situation, giving Romero an indirect command to comply with his earlier order: "Listen to me. This can go smoothly or it can go rough for you. I suggest that you go with what I'm asking you, alright, or I'll charge you with resisting, obstructing. It's your choice." Id.
Romero again protested, asking exasperatedly, "Are you going to give me a ticket or what?" Id. Officer Dollar subsequently issued his second indirect command, noting "I'm going to put you in handcuffs and take you to jail." Id. Romero then remarked, "I don't want to go to jail"-at which point Officer Dollar pulled out his taser, aimed it at Romero, and stated, "or we can go this route." Id. The officer then issued his second direct command, ordering Romero to "Put it down." Id. Only then did Romero comply with Officer Dollar's lawful command to put his items on the ground. Notably, twenty-four seconds elapsed-and four commands, two direct and two indirect-between when Officer Dollar first told Romero to put his things on the ground and submit to a pat-down and when Romero finally put his phone and water bottle on the ground.
And still Romero did not comply with Officer Dollar's order to submit to a protective pat-down. He continued to argue. When the officer ordered "Put your hands on the wall," Romero tried to take his backpack off. Id. When Officer Dollar told him not to "reach for anything," Romero protested while turning his back on the officer for a second time, "Ah, man. Why do you want to (unintelligible)?" Id. Another fifteen seconds elapsed between when Officer Dollar told Romero to put his hands on the wall and when Romero got on the ground so the officer could perform the pat-down. Altogether, Romero forestalled his impending pat-down by around forty seconds by challenging Officer Dollar's orders. These actions-both unreasonably ignoring multiple direct and indirect commands and turning his back on the officer twice-gave Officer Dollar probable cause to conclude Romero had chosen "to challenge or forestall" the pat-down search by "refusing to comply with orders." Jimenez , 392 P.3d at 682.
We cannot choose which test to apply when we have a published opinion from the New Mexico courts interpreting New Mexico law. And Romero's actions prove sufficient under the test set forth in Jimenez .
* * *
I would affirm the district court on both issues. Officer Dollar was entitled to perform a protective pat-down of Romero's *1138 outer clothing when he spotted a knife clip at Romero's hip. And he had probable cause to arrest Romero for resisting an officer under New Mexico law when Romero chose to challenge the officer's decision to pat him down and refused to comply with multiple direct and indirect orders.
I therefore dissent.

The majority also relies on this court's decision in Keylon v. City of Albuquerque , 535 F.3d 1210 (10th Cir. 2008), where we held that a woman had not violated § 30-22-1(D) when she gave an officer evasive answers and did not immediately comply with all orders. The New Mexico Court of Appeals had not yet decided Jimenez , however, and this court cited only New Mexico v. Wade , 100 N.M. 152, 667 P.2d 459, 460 (N.M. Ct. App. 1983), which held that "[r]esisting, evading, or obstructing an officer primarily consists of physical acts of resistance." With only Wade on which to base our decision, it is unsurprising the court concluded Keylon did not violate the statute because she did not "engage[ ] in any physical act of resisting prior to her arrest." Keylon , 535 F.3d at 1216. But now that the New Mexico courts have further defined the scope of the statute, we must apply current state law.