In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3174

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LORENZO L. MITCHELL,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 99 CR 10077--Joe B. McDade, Chief Judge.

Argued FEBRUARY 27, 2001--Decided July 11, 2001

Before COFFEY, RIPPLE and EVANS, Circuit
Judges.

COFFEY, Circuit Judge.  On October 19,
1999, a criminal complaint was filed in
the United States District Court for the
Central Division of Illinois charging
Lorenzo L. Mitchell with being a felon in
possession of a firearm, in violation of
18 U.S.C. sec. 922(g)(1). On November 10,
1999, the defendant filed a motion to
suppress the handgun in question,
alleging that the officers illegally
discovered his firearm. On January 25,
2000, the district court denied the
motion to suppress, concluding that under
the totality of the circumstances the
officers' actions in taking possession of
the defendant's firearm were legal.
Mitchell was arraigned, entered a plea of
not guilty, and waived his right to a
jury and his right to the appointment of
counsel./1 After a bench trial,
Mitchell was found guilty on March 27,
2000, and sentenced to 46 months'
imprisonment, three years' supervised
release, and a $100 special assessment.
Mitchell appeals the denial of his motion
to suppress. We affirm.

I.  BACKGROUND

   At approximately 9:49 p.m., on October
5, 1999, Peoria Police Officers Jeff
Wilson and Tim Moore responded to a call

on the police radio of "shots fired" within the 1700 block of Bigelow Street in Peoria, Illinois, a known gang area./2 The police dispatcher provided the purported description of the suspect: a black male walking north on Bigelow Street toward Nebraska Street. The officers radioed that they would respond, and it took them only 90 seconds to arrive at the reported area of shots fired.

Once in the area, the officers observed five individuals in the immediate vicinity; three female children were standing on the front porch of 1715 Bigelow and two men were on the sidewalk in front of 1709 Bigelow./3 The two men, Jason Bennett and Lorenzo Mitchell, were both known to the police officers as a result of their previous criminal activities.

Jason Bennett, one of the most dangerous gang members in Peoria, was the leader of the Bennett brothers who ran the "Bigelow Boys." According to Officer Wilson's testimony, "it came to be well-known in the department that where there was Jason [Bennett], there was usually a gun close by."

Officer Moore was very familiar with the defendant, as Mitchell was a suspect in a prior shooting incident Moore investigated. Also, Mitchell had a reputation for being associated with guns and violence.

When the officers saw the two men, they stopped their car and asked Bennett and Mitchell if they had heard any gunfire. Both men responded in the negative. Not wanting to turn their backs on these two dangerous men, Officer Moore ordered Bennett and Mitchell to "come over here to the front of the car and put your hands on the car, because we're going to pat you down for weapons." Bennett immediately complied with the order, but Mitchell refused and continued to stand in the same area and inquired as to what he had done wrong. Not only did Mitchell refuse to consent to the pat-down, he proceeded to place his hands in his coat pockets, raising the suspicion that he might be armed. After Mitchell placed his hands in his coat pockets, Officer Moore withdrew his firearm, pointed it at Mitchell, and again ordered him to go

over to the squad car to submit to a pat-down search.

   Although Mitchell took his hands out of his pockets and started to walk over to the squad car, the officers were still suspicious and Officer Moore kept his gun trained on Mitchell. The suspect kept looking to the left and right and asking what the problem was. As Mitchell approached the police car, he placed his hands on the hood but immediately withdrew them. Mitchell then proceeded to move to his left (in the direction of Officer Moore). Officer Moore, unsure of "whether or not [Mitchell] was going to try to rush" him, started to put his gun away./4 It was at this moment that Mitchell took off running.

   Although Officer Moore was able to grab Mitchell's coat, the suspect was able to slip out of his coat and continue his flight. As Mitchell ran, both officers testified that they were able to observe that the suspect was running with his hand on the front of his waist, leading them to believe that the suspect was armed. According to Officer Wilson's testimony:

From past experience, [the fact that Mitchell's hand was on the front of his waist] either signified that, one, they're holding on to something in their waistband, be it a gun or drugs. As I stated in my report, I strongly felt in this case, considering the shots fired call we had received and Mr. Mitchell's action, that it was a--it was a gun in his case.

   After a short chase, Officer Wilson was able to shove Mitchell to the ground. As Mitchell fell to the ground, Officer Wilson observed a pistol in Mitchell's right hand and saw him lose control of the gun as Mitchell hit the ground. As Officer Wilson moved in to arrest the suspect, Mitchell punched Wilson in the face. After a brief struggle, Officer Moore caught up with the two men and assisted his partner in restraining and cuffing Mitchell. Officer Moore recovered a loaded Colt .22 caliber semi-automatic pistol from the area.

   After Mitchell was charged with being a felon in possession of a firearm, he filed a motion to suppress the weapon on

the grounds that the officers did not have the legal authority to order him to submit to a pat-down search. After a hearing on the motion to suppress, the trial judge denied the motion and concluded that under the totality of the circumstances the officers had the authority to search Mitchell. As mentioned above, the defendant waived his right to a jury trial and his right to an attorney, and was found guilty on March 27, 2000. The defendant appeals the denial of his motion to suppress.

II.  ANALYSIS

In reviewing the district judge's decision to deny a motion to suppress, this court reviews questions of law de novo and questions of fact for clear error. United States v. Williams, 209 F.3d 940, 942 (7th Cir. 2000). Therefore, "we review de novo the ultimate conclusion that the police did not have reasonable suspicion to stop or search the individual, but we review all findings of historical fact and credibility determinations deferentially, under the clear error standard." United States v. Johnson, 170 F.3d 708, 712-13 (7th Cir. 1999). In this case, the defendant is not challenging the district court's factual findings or any credibility determinations. Rather, this case turns on the legal question of whether the officers had sufficient information to order Mitchell to place his hands on the hood of the police car and submit to a pat-down search.

In considering whether the police had sufficient cause to order the defendant to submit to a pat-down search, it is most important that we understand the facts and knowledge the officers had at that time. Initially, the officers had been informed, via the police dispatcher, that an anonymous phone caller had reported shots being fired in the vicinity of the 1700 block of Bigelow Street and that the suspect involved was a black male walking north on Bigelow Street toward Nebraska Street. The two experienced officers arrived at the scene some 90 seconds after receiving the report. Once at the scene, the officers encountered two black men on Bigelow. Importantly, according to the officers' testimony, these were the only adult males in the area and both men were known

gang members. Furthermore, based on the officers' knowledge and prior experience, both men were considered to be very dangerous.

As discussed previously, Jason Bennett, one of the most dangerous gang members in Peoria, was the leader of the Bennett brothers who ran the Bigelow Boys. According to Officer Wilson's testimony, "it came to be well-known in the department that where there was Jason, there was usually a gun close by."

It is also important to note that Officer Moore was very familiar with the defendant's violent and illicit past, as Mitchell was a suspect in a prior shooting incident Moore investigated. Also, Mitchell had a "propensity to carry guns" and was considered dangerous.

Immediately suspicious, especially given the known history of these two men, the officers asked if either of them had heard any shots fired. They both responded in the negative. Officer Moore then ordered the two men to submit to pat-down searches./5 According to Officer Wilson,

You get a call of shots fired in the area. This is an area that we know that's--that's absolutely 100-percent good for those types of calls, that there are violent shots fired and calls that come in in that neighborhood, either be it drive-bys or just random acts of shooting at each other in the street. Again, I know Jason Bennett very well. Jason Bennett again is part of the Bigelow Boys street faction of the Gangster Disciples. Jason Bennett is considered by this Department to be a shooter and has proven that fact by his own actions. For me to know Jason and to go into that neighborhood with a shots fired call received and to simply drive past him, walk past him, whatever the case may be, without encountering him, it's--that's asking for a bullet in the back. He's just simply not a person that you trust at all.

In Terry v. Ohio, 392 U.S. 1, 23-24 (1968), the United States Supreme Court recognized the importance of allowing police officers some leeway under the Fourth Amendment in order that they might protect themselves and others. According

to Terry:

We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.

Id. at 23. The Court went on to conclude that given the dangers police officers face everyday,

we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

Id. at 24.

Finally, the Court noted that "a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime." Id. at 26-27. This is exactly what happened in this case. The officers, upon their arrival at the scene, clearly did not have sufficient information to immediately arrest Mitchell for being a felon in possession. However, we are of the opinion that the combination of a report of shots being fired, the rapid response time of the officers (approximately 90 seconds), the fact that Mitchell matched the general (albeit limited) description of the suspect, the fact that Mitchell and Bennett were known to the officers as gang members and dangerous men, the fact that both men had a propensity to carry weapons, that they were the only adult black males that

could be seen on the 1700 block of Bigelow, that the 1700 block of Bigelow was a known "hot-spot" for criminal activity, and that they both denied hearing shots fired, gave both officers a "perfectly reasonable apprehension of danger."/6 Accordingly, under the totality of the circumstances we hold that the two officers had a sufficient legal basis to conduct an investigation, including a Terry stop.

We note that such a conclusion is consistent with prior cases decided by this court. For example, in United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999), this court stated:

Here the totality of the circumstances also included Brown's demeanor, which was more nervous than one would expect in a routine traffic stop, and his failure to meet Wildauer's gaze. Nervousness or refusal to make eye contact alone will not justify a Terry stop and pat- down, see United States v. Jerez, 108 F.3d 684, 694 (7th Cir. 1997), but such behavior may be considered as a factor in the totality of circumstances. See Finke, 85 F.3d at 1282 n. 4 (citing cases). The totality of the circumstances also included Brown's repeatedly glancing back towards the car in question while its occupants rolled down the tinted windows. Brown gives us no reason to doubt these factual findings. Neither does he suggest any other innocent explanation which might plausibly account for his excessive nervousness.

Finally, the exchange took place in a high crime area where there had been drug activity, shootings, and gang violence. Although "'the fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct,' " Jerez, 108 F.3d at 694 (quoting Brown v. Texas, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed.2d 357 (1979)), "courts may consider the defendant's presence in a high crime area as part of the totality of circumstances confronting the officer at the time of the stop." Quinn, 83 F.3d at 922 n. 2. The police do not have carte blanche to pat down anyone in a dangerous neighborhood, but Brown had been stopped for speeding while driving a car under surveillance for drug trafficking and

redolent of marijuana smoke. He was excessively nervous, refusing to meet the officer's gaze and repeatedly glancing back towards the car as his passengers rolled down its tinted windows--and he was in a bad neighborhood. Against this background, Officer Wildauer had a reasonable suspicion that Brown might be armed and dangerous which was sufficient to support his decision to conduct the pat-down search.

[Emphasis added].

Mitchell's conviction and sentence are

AFFIRMED.

FOOTNOTES

/1 The trial judge appointed stand-by counsel.

/2 Jeff Wilson is a 12-year veteran with experience in both the Street Crimes Unit and as a patrol officer. Tim Moore has been a police officer for over 10 years and has worked as a patrol officer, a walking beat officer in the city's housing projects, a vice and narcotics officer, a field training officer, and in the Street Crimes Unit. On this particular night, both men were assigned to the Street Crimes Unit.

/3 A gang called the Bigelow Boys (an offshoot of the Gangster Disciples) controlled this area and the five leaders of the Bigelow Boys (the Bennett brothers) resided at 1715 Bigelow Street, their grandmother's house. In fact, there were more police calls to 1715 Bigelow Street than any other address in the area.

/4 Officer Moore stated that he started to put his gun away when he suspected Mitchell might charge him because he would not be justified in shooting the suspect and he would be unable to physically restrain him with a gun in his (Officer Moore's) hands.

/5 We, like the district court, are concerned with Officer Moore's statement that he would have patted down any black male in the vicinity. Obviously, such conduct is in violation of the Fourth Amendment and we hope that AUSA Tate Chambers' promise to the trial judge that Officer Moore would undergo additional training will be carried out. Because we are confident that race was not a controlling factor in the officers' decision to stop the two men, we need not address Officer Moore's comments any further.

/6 The fact that Officer Moore withdrew his firearm

from his holster in order to conduct the Terry stop does not necessarily transform Mitchell's detention into an arrest. United States v. Harley, 682 F.2d 398, 402 (2d Cir. 1982); United States v. Trullo, 809 F.2d 108, 113 (1st Cir. 1987); United States v. Lane, 909 F.2d 895, 899 (6th Cir. 1990); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1221 (11th Cir. 1993); Foote v. Dunagan, 33 F.3d 445, 449 n. 3 (4th Cir. 1994).