In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2659

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAPHAEL W. PATTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 10 CR 10102—**Michael M. Mihm**, *Judge*.

ARGUED FEBRUARY 24, 2012—DECIDED JANUARY 29, 2013

Before MANION and ROVNER, *Circuit Judges*, and
COLEMAN, *District Judge*.*

ROVNER, *Circuit Judge*. After a Ruger nine-millimeter
pistol was discovered in the waistband of his pants in
the course of a stop and frisk, Robert W. Patton was

---

* The Honorable Sharon Johnson Coleman, of the United States
District Court for the Northern District of Illinois, sitting
by designation.

charged with being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). Patton moved to suppress evidence relating to the gun, contending that the officer who frisked him lacked a reasonable suspicion that he might be armed. *See Terry v. Ohio*, 392 U.S. 1, 27, 30-31, 88 S. Ct. 1868, 1883, 1884-85 (1968). After the district court concluded otherwise, Patton pleaded guilty to the weapons charge while reserving the right to appeal the denial of his motion to suppress. We now affirm the district court's determination that the patdown was supported by a reasonable suspicion that Patton might be armed and therefore pose a danger to the officers who stopped him.

## I.

At approximately 1:30 a.m. on August 11, 2010, Peoria police officer Ryan Winkle and his partner were dispatched to investigate a group of seven or eight men who reportedly were drinking beers on a public sidewalk, in violation of a city ordinance. Winkle and his partner were assigned to the police department's violent crime task force; the supervisor of that task force had been asked by a local detective to look into the matter.

The location to which the officers were dispatched was situated in a high-crime area of Peoria. Gangs were active in the area; there had been multiple, recent reports of shots-fired; and two nights earlier, two people had been the victims of a drive-by shooting one block away from the specific location to which the officers were dispatched.

At least six members of the task force in three squad cars arrived on the scene and converged on the men from different directions, effectively blocking any route of escape. The men were variously standing on the street, sidewalk, and adjacent lawn, and a number of them had open cans of beer in their hands. Most immediately threw their beers to the ground; one tried to hand his can to Winkle, who instructed him to drop it. Patton was among the group of men although, so far as Winkle knew, he was not one of those who had a drink in his hand.

The officers directed the men to step over to a Cadillac parked nearby on the street. Winkle would later testify that he and the other officers intended to issue citations to the men for violating Peoria's open-container ordinance, while being on the lookout for other more serious offenses. First, however, the officers were going to frisk the men for weapons. Winkle explained:

> [B]ecause of the area, if we're going to stand and write out drinking tickets, I want to conduct a pat-down for weapons, and the reason being is I don't want to have my back turned on anybody if I'm trying to write a ticket and have somebody possibly be armed. I feel very uncomfortable, feel vulnerable, the equivalent of getting into a car and start driving without putting on a seat belt is the best way I can describe the feeling. So, I wanted to conduct a pat-down.

R. 29 at 21-22.

At this point, Winkle noticed Patton doing something that distinguished himself from the other members of the

group. Instead of stepping over to the Cadillac as the officers had instructed, Patton was backing away from the other men, looking from side to side nervously, like a "deer in the headlights." R. 29 at 23, 37, 40, 45. Patton took at least five steps away from the other men; by Winkle's estimate, he backed away between five and fifteen feet from the sidewalk where he had been standing and onto the lawn behind him. The district judge, after having Winkle re-enact Patton's actions in court, found that Patton stepped at least ten feet away from the other men. R. 29 at 54. Winkle perceived Patton's behavior as consistent with a "flight or fight" response to a police presence; and in his seven years' experience as a police officer, when an individual stopped for a relatively minor offense reacts in that manner, it usually means either that he has a weapon or is wanted on a high-bond arrest warrant. Winkle explained:

> With a weapon or a high bond warrant, . . . somebody knows they're going to be going to jail, and the chances of them getting out soon are not good. For like a small bag of cannabis or a traffic warrant or something similar to that, an outstanding case for a simple battery, I'm not usually going to get that type of reaction.

R. 29 at 15-16.

As he looked from side to side, Patton would have seen that officers were approaching him from multiple directions; and ultimately he changed course and began walking forward toward the car as the officers had instructed, his demeanor still nervous. In view of Patton's

behavior, Winkle decided to pat down Patton first. Winkle advised Patton, who by this point had his arms partly raised, that he was about to be frisked for safety purposes. Winkle then patted the front of Patton's waistband and immediately felt what he recognized as the handle of a gun. Winkle immediately grabbed Patton's wrists and instructed another officer to handcuff Patton, and shortly thereafter that officer removed the nine-millimeter Ruger from Patton's pants.

After he was indicted for being a felon in possession of a weapon (Patton had two prior felony drug convictions), Patton moved to suppress evidence relating to discovery of the weapon. The district court convened an evidentiary hearing, at which Winkle was the sole witness. Winkle recounted events as we have described them.

At the conclusion of the hearing, the district court denied Patton's motion, concluding, based on the circumstances confronting Winkle, that he reasonably suspected Patton might be armed, such that a pat-down was permissible. The court found in the first instance that Winkle's testimony was credible, noting that Winkle was "refreshingly candid on virtually everything that he was asked." R. 29 at 67. "[O]fficers can exaggerate what happened or fabricate," the court added later. "I don't believe either one of those was involved here." R. 29 at 70. With respect to the justification for the frisk, the court found it significant that the incident occurred at 1:30 a.m. and in an area where there was ongoing gang activity, recent reports of gunfire, and a drive-by

shooting just two days earlier. R. 29 at 67-68. That back-drop, coupled with the report that as many as seven or eight adults were involved in the drinking incident, warranted the caution that was evident from the decision to dispatch at least three squad cars and six police officers to the scene. R. 29 at 68-69. The court also found it "very telling" that when the group of men was instructed to move over to the car, everyone but Patton complied; Patton took "considerably more than just a back-up step that a person might take," and instead took "four or five or six steps" backward while looking from side to side nervously. R. 29 at 69. Once Patton did that, the court reasoned, it was reasonable for Winkle to suspect that Patton might be armed. "I think under all of those circumstances, it was not unreasonable for the officer to conduct a frisk because I think at that point, . . . he had reason to believe that this guy could be carrying a gun. And I believe that the search—the frisk here was . . . justified under *Terry v. Ohio* . . . ." R. 29 at 70.

## II.

The district court's determination that the protective pat-down of Patton was supported by reasonable suspicion that he might be armed is a legal determination that we review de novo. *E.g.*, *United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011), *cert. denied*, 132 S. Ct. 1910 (2012). Absent clear error, we of course defer to any findings of historical fact and credibility determinations that the district court made based on the testimony presented to it. *Id.* As the district court credited Winkle's

testimony, we accept, as the district court did, his description of the events culminating in his pat-down of Patton.

We begin by noting that there is no dispute that the officers had sufficient cause to stop and detain the group of men for investigatory purposes. *Terry* authorizes such a stop when an officer has a reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot. 392 U.S. at 21-22, 30, 88 S. Ct. at 1880, 1884. In this case, the officers arrived on scene to observe a number of men on the public way with open cans of beer in their hands.[1] It was reasonable for the officers to surmise that the men were violating a local ordinance proscribing both the possession of open containers of alcoholic beverages and the consumption of alcohol on the public way. *See* Peoria Municipal Code § 20-99(a) ("No person shall transport, carry, possess or have upon any public place or public way in the city any alcoholic liquor on or about his person except in the original package and with the seal unbroken. No person shall consume any alcoholic liquor upon any public

---

[1] By Winkle's account, some of the men were standing on a private lawn adjacent to the sidewalk. R. 29 at 19, 32. Winkle conceded that standing on the lawn with an open container of alcohol would not violate the local ordinance. R. 29 at 32. Winkle believed that Patton was standing on the sidewalk when the officers arrived, R. 29 at 48, although as we have noted he could not say that Patton had a beer can in his hand, R. 29 at 35. In any case, Patton does not argue that the officers lacked an adequate basis on which to conduct an investigatory stop of himself and the other men present.

place or public way within the city, except on premises licensed for the retail sale of alcoholic liquors for consumption on the premises.").

The disputed issue is whether Winkle was justified in conducting the pat-down which revealed the presence of the firearm on Patton's person. In addition to authorizing an investigatory stop when there is reason to believe a crime is being committed, *Terry* permits the officer conducting such a stop to conduct a limited search of the suspect to determine whether he is armed, when the circumstances give rise to a reasonable belief that the individual may have a weapon and thus pose a danger to the officer or others in the immediate vicinity. 392 U.S. at 27, 30-31, 88 S. Ct. at 1883, 1884-85. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S. Ct. at 1883. This is an issue that turns on the totality of the circumstances confronting the officer. *E.g., Snow*, 656 F.3d at 501.

Before we turn to those circumstances, it bears emphasis that the reasonable suspicion standard is an objective one. *Terry*, 392 U.S. at 27, 88 S. Ct. 1883; *United States v. Barnett*, 505 F.3d 637, 639-40 (7th Cir. 2007). As Patton has pointed out, Winkle testified that it was his intent to frisk the men from the outset of the encounter, before Patton distinguished himself from the others by stepping backward in contravention of the officers' instruction. R. 29 at 21-22. Winkle also acknowledged

that although the officers planned to cite the men for the open-container violation, they were also looking for more serious transgressions with which to charge the men. R. 29 at 31. Whether the ensuing frisk of Patton was justified under *Terry* does not turn on Winkle's subjective intent and perception of the facts, however. *See Barnett*, 505 F.3d at 640. What matters is whether a reasonable police officer, faced with the circumstances confronting Winkle, would believe that Patton posed a danger to those in the immediate vicinity. *Terry*, 392 U.S. at 27, 88 S. Ct. at 1888. We now turn to those circumstances, beginning with the general and moving toward the specific.

We note first, as the district court did, that the area in which the incident occurred gave police officers particular reason to be concerned about the possibility of gun-related violence. The neighborhood was known as a high-crime area of the city; but more importantly, there were indications of gang activity, recent reports of shots fired, and the occurrence of a drive-by shooting with two victims two days earlier and one block away from the location where the men were discovered drinking. These specific and recent indicia of violence, including gun-related violence, increased the odds that an individual detained at this location for apparent criminal activity (even a petty offense like the one at issue here) might be armed. The incidence of crime in the area would not by itself legally justify a protective pat-down. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000) (citing *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637 (1979)); *Maryland v. Buie*, 494 U.S. 325, 334 n.2, 110 S. Ct.

1093, 1098 n.2 (1990). But it is one factor which, in conjunction with the other circumstances we discuss, contributed to a reasonable suspicion that Patton might be armed. *See United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010); *United States v. Mitchell*, 256 F.3d 734, 739 (7th Cir. 2001); *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999); *United States v. Evans*, 994 F.2d 317, 322 (7th Cir. 1993).

Second, the investigatory stop occurred at 1:30 a.m., essentially the middle of the night. We have recognized that "[a] nighttime traffic stop, especially in an area where crime is not a stranger, is more fraught with potential danger to an officer than would be a stop during the light of day." *United States v. Brown*, 273 F.3d 747, 748 (7th Cir. 2001); *see also Adams v. Williams*, 407 U.S. 143, 147-48, 92 S. Ct. 1921, 1924 (1972) (noting late hour as among facts giving officer reason to fear for his safety); *United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011) (noting fact that "[t]he stop occurred late on a Friday night in a high-crime neighborhood" as among circumstances which supported frisk); *but see also id.* at 758 (Hamilton, J., dissenting) ("neither the lateness of the hour nor the nature of the locale automatically transforms non-threatening acts into indicators of danger").

Third, the men were consuming alcohol when the officers arrived. The officers had no way of knowing how much alcohol the men had consumed, nor could they know whether and how much Patton in particular had been drinking (Winkle testified that he did not see a beer can in Patton's hand and, so far as he knew, his

colleagues did not see one either). But given that a number of the men were drinking, Winkle and his colleagues had greater reason to be concerned that any one of the men might do something unpredictable, unwise, and dangerous. *See*, *e.g.*, *United States v. Knight*, 562 F.3d 1314, 1327 (11th Cir. 2009) (smell of marijuana and alcohol among factors that supported pat-down); *United States v. Holmes*, 385 F.3d 786, 789-90 (D.C. Cir. 2004) (Roberts, J.) (suspect's admission that he was drinking cited as a factor supporting protective frisk).

Turning now to Patton's behavior, two aspects of his conduct bear discussion. First, Patton set himself apart from the other men when, rather than complying with the officers' instruction to step over to the car parked in the street, Patton took a number of steps backward, covering a distance of (by the district court's estimation) ten feet. We agree with the district court that Patton's movement was telling. A half-step or step in the wrong direction might bespeak ordinary hesitation or confusion, but five steps suggests purposeful evasion; and the Supreme Court has recognized that an individual's evasive behavior is a factor that contributes to a reasonable suspicion to the officers who confront him. *Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676 (coll. cases). At the same time, a suspect's failure or refusal to comply with a police officer's order is also a factor that contributes to a reasonable suspicion that he may be dangerous. *See*, *e.g.*, *United States v. Denney*, 771 F.2d 318, 322 (7th Cir. 1985) (refusal to keep hands in sight and exit vehicle); *United States v. Simmons*, 560 F.3d 98, 108 (2d Cir. 2009) (refusal to remove hands from pocket); *United*

*States v. Stachowiak*, 521 F.3d 852, 856-57 (8th Cir. 2008) (refusal to step out of car); *United States v. Soares*, 521 F.3d 117, 121 (1st Cir. 2008) (refusal to remain still and keep hands within officer's view); *United States v. Bell*, 762 F.2d 495, 502 (6th Cir. 1985) (refusal to place hands on car dashboard, exit from car, and place hands on roof of car).[2]

   Second, as he backed away from the others, Patton exhibited a nervous demeanor, glancing from side to side. Patton discounts his nervous appearance, suggesting that the arrival of three police cars and the convergence of at least six officers on the men from different directions would elicit a similar response from most individuals. But what Winkle described was not a mere look of concern or alarm; he emphasized that Patton was "backing away from the group, not coming towards us when ask[ed], looking side to side . . . possibly looking for an escape route, appearing very nervous, kind of a deer-in-the-headlights look." R. 29 at 22-23. Most individuals, he explained, will make eye contact with him as he approaches; Patton did not. R. 29 at 23-24. Winkle also noted that Patton's nervous demeanor per-

---

[2] We note that it is not clear from the record at precisely what moment Patton began to step backward away from the other men and from the officers who were converging on them, and in particular whether he started to do so before or after he and the others were directed to step over to the Cadillac. However, it seems clear from Winkle's testimony that Patton, at a minimum, continued to back up after that order was given. *See* R. 29 at 22 (Winkle notes as a "red flag" the fact that Patton was "not coming towards us when ask[ed].").

sisted even after he stopped backing away from the others and came forward toward the Cadillac as instructed. R. 29 at 24. It is a fair inference from Winkle's testimony that the manifestation and degree of Patton's nervousness was unusual; Winkle described it as a "red flag." R. 29 at 22. A display of nervousness is frequently recognized as a sign that a suspect has something to hide, including a weapon. *See Oglesby*, 597 F.3d at 894 ("The Supreme Court has recognized in numerous cases that nervous or evasive behavior 'is a pertinent factor in determining reasonable suspicion.'") (quoting *Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676); *Barnett*, 505 F.3d at 640 (noting suspect's "high degree of nervousness" as a reason that initial suspicion suspect might be armed did not dissipate during questioning, notwithstanding suspect's cordiality and cooperation with officers); *United States v. Brown*, *supra*, 188 F.3d at 865 (citing nervousness and refusal to make eye contact as a factor relevant to reasonable suspicion).

As we have noted, Winkle testified that in his experience, when a suspect exhibits a "flight or fight response" to a police presence, it usually means that the suspect has a weapon or is wanted on a high-bond warrant for a serious offense. Because the reasonable suspicion standard is an objective one, Winkle's subjective interpretation of Patton's behavior does not control our own assessment of whether the circumstances confronting Winkle supported the pat-down. Nonetheless, the inferences that an experienced officer like Winkle draws from an individual's behavior do inform our assessment of what a reasonable person in

Winkle's position would think about the likelihood that
the suspect poses a danger to him. *See United States v.
Arvizu*, 534 U.S. 266, 273-74, 122 S. Ct. 744, 750-51 (2002).
Winkle's belief, based on his years in the field, that the
possession of a gun was a plausible explanation for
Patton's nervous and evasive behavior strikes us as
reasonable, and we agree with the district court that
the way in which Patton backed away from the officers
and the other suspects gave rise to a reasonable
suspicion that he might be armed.

Indeed, we drew the same inference in *Oglesby* based
on facts similar to those presented here. In that case,
multiple police officers converged on a group of men
who were blocking a sidewalk, in violation of a local
ordinance. As the officers approached the men, the de-
fendant was observed looking from side to side, drop-
ping his hand toward his pocket, taking a few steps
backward, and angling his body away from the officers.
We construed that behavior, which took place at a late
hour in a high-crime neighborhood, as a significant
reason why it was reasonable for the officers to believe
that the defendant was armed:

> Oglesby was the only man in the group who seemed
> to be taking evasive action during the confrontation.
> There is nothing in the record to indicate any reason
> why a law-abiding person in Oglesby's position
> would have cause to be nervous or back away from
> the officers. In addition, the police officers testified at
> the suppression hearing that, based on their experi-
> ence, Oglesby's behavior led them to believe that

> Oglesby might be a flight risk. Such behavior, coupled with the other circumstances surrounding the *Terry* stop, would create a reasonable suspicion that Oglesby was carrying a gun or was otherwise engaged in unlawful activity.

597 F.3d at 894. As Patton is quick to remind us, we also found it noteworthy that Oglesby moved his hand toward his pants pocket and also turned the same side of his body away from the officers. *Id.* at 894-95. Patton did not exhibit these additional movements. Nonetheless, *Oglesby* remains pertinent for its endorsement of the very sort of inference that Winkle said he drew from Patton's own evasive behavior.

We acknowledge that the possession of a gun was not the only possible explanation for Patton's behavior. Winkle himself cited another possibility: that Patton might be wanted on a high-bond warrant. But the reasonable suspicion standard does not demand that the possession of a weapon be the sole or most likely explanation for a suspect's behavior. *Terry* rejected the notion that an officer must be certain that an individual is armed. 392 U.S. at 27, 88 S. Ct. at 1883. Subsequent cases have emphasized that "[r]easonable suspicion is a less demanding standard than probable cause . . .," *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990), which itself "requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true," *Thayer v. Chiczewski*, — F.3d —, 2012 WL 6621169, at *6 (7th Cir. Nov. 27, 2012) (quoting *Mucha*

*v. Vill. of Oak Brook*, 650 F.3d 1053, 1056-57 (7th Cir. 2011)). An "inchoate and unparticularized suspicion or 'hunch'" will not do, *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883); but so long as the suspicion that an individual could be armed is supported by specific, identifiable facts, it is an objectively reasonable suspicion that satisfies *Terry*, *e.g., United States v. Thomas*, 512 F.3d 383, 388 (7th Cir. 2008). For all of the reasons we have discussed, the time, place, and reason for the stop, coupled with Patton's evasive behavior as the officers approached the group and the men were directed to step forward, supported a reasonable suspicion that he might be armed.

Contrary to Patton's suggestion, that suspicion did not evaporate when, after taking several steps backward, he ultimately changed course and walked over to the car with the others of his own volition. We cannot know what went on inside of Patton's head. One possibility we have mentioned is that Patton, having looked around himself, realized that he was surrounded and that escape was impossible. Whatever caused him to stop backing up, the fact remains that it was Patton's first instinct to disobey the officers and to step purposely away from the other men in the group; coupled with his overtly nervous demeanor, that is what gave rise to a reasonable suspicion that he might have a weapon that he did not wish the officers to discover. His subsequent accession to the officers' command to step over to the car did nothing to undermine that suspicion. *See United States v. Snow*, *supra*, 656 F.3d at 501, 503-04 (defendant's

cordial and cooperative interaction with officer during stop did not undermine reasonable suspicion, based on independent facts, that he might be armed).

## III.

Because the facts confronting Officer Winkle supported a reasonable suspicion that Patton might be armed, Winkle and his colleagues were entitled under *Terry* to conduct a protective pat-down. The district court therefore correctly denied Patton's motion to suppress evidence of the pistol that was discovered on his person.

AFFIRMED.