RIPPLE, Circuit Judge,
concurring in part and dissenting in part.
I agree with Judge Stadtmueller that Officer Jesberger’s stop of Mr. Williams was justified. It is clear that, in order to perform a constitutional “stop,” circumstances must lead an officer “reasonably to conclude in light of his experience that criminal activity may be afoot.” Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As one commentator has noted, “reference to when ‘criminal activity may be afoot’ strongly suggests that though the arrest standard may sometimes require that guilt be more probable than not, this is never the case as to a stopping for investigation, where the very purpose is to clarify an ambiguous situation.” Wayne R. LaFave et al., Criminal Procedure § 3.8(d) (5th ed.2009), (footnote omitted). Consequently, although an officer may have discovered, upon investigation, that the reported display of weapons was without criminal or malicious intent, see Judge Hamilton’s Op. at 4 (quoting Wis. Stat. § 947.01(2)), the fact that weapons were (1) being brandished by individuals, (2) who were part of a boisterous crowd of twenty-five, (3) outside of a bar, (4) which previously had been identified as a high-crime location, (5) late at night, and (6) in such a manner as to cause passersby to leave the area and contact authorities, justified police investigation. No protections for gun owners set forth in the Wisconsin Statutes negate the constitutional and salutary efforts of police to look into the possibility that weapons were being used to escalate an argument or to *695 engender intimidation, or were being waived recklessly by intoxicated individuals in a way that might endanger the public. The fact that any of the circumstances described by the caller “may have been independently susceptible to innocent explanation does not negate their collective contribution to Officer [Jesberger’s] reasonable suspicion under the totality of the circumstances.” United States v. Richmond, 641 F.3d 260, 262 (7th Cir.2011).
Unlike my colleagues, however, I believe that the frisk performed by Officer Jesber-ger also was supported by reasonable suspicion. I therefore respectfully dissent.
A.
The Supreme Court in Terry, 392 U.S. at 24, 88 S.Ct. 1868, recognized “the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.” Thus, “[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,” he is permitted to take reasonable steps to assure the safety of himself and others. Id. This includes conducting “a reasonable search for weapons.” Id. at 27, 88 S.Ct. 1868.
However, once an officer has lawfully stopped a suspect, he is not automatically entitled to conduct a protective pat-down or frisk. “[T]here must be a separate analysis of whether the standard for pat-frisks has been met.” United States v. McKoy, 428 F.3d 38, 39 (1st Cir.2005); see also United States v. Brown, 188 F.3d 860, 864 (7th Cir.1999). “The officer need not be absolutely certain that the individual is armed”; rather he must have a reasonable suspicion that his “safety or that of others [i]s in danger.” Terry, 392 U.S. at 27, 88 S.Ct. 1868. The Court has explained that the necessary quantum of proof to establish reasonable suspicion “is considerably less than proof of wrongdoing by a preponderance of the evidence.” United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). “[T]he reasonable suspicion standard is an objective one,” which asks “whether a reasonable police officer, faced with the circumstances confronting [the officer in the ease], would believe that [the suspect] posed a danger to those in the immediate vicinity.” United States v. Patton, 705 F.3d 734, 738 (7th Cir.2013) (citing Terry, 392 U.S. at 27, 88 S.Ct. 1868). Thus, whether an officer has reasonable suspicion “turns on the totality of the circumstances confronting the officer.” Id.
The Supreme Court has explained that the totality of the circumstances requires “tak[ing] into account” “the whole picture.” United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The Court elaborated:
[T]he assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person.
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfin-ders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood *696 by those versed in the field of law enforcement.
Id. at 418, 101 S.Ct. 690 (emphasis added). Circumstances to be considered as part of the reasonable suspicion analysis include: the officer’s experience and training, United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); the stop’s location, United States v. Tinnie, 629 F.3d 749, 752 (7th Cir.2011) (noting that the stop occurred in a high-crime area); when the stop occurred, Patton, 705 F.3d at 738 (noting that the stop occurred in “essentially the middle of the night”); and the suspect’s demeanor and behavior, United States v. Ocampo, 890 F.2d 1363, 1368 (7th Cir.1989). Frequently “[a]ny one of these factors [identified by the officer] is not by itself proof of any illegal conduct and is quite consistent with innocent [conduct]. But ... taken together they amount to reasonable suspicion.” Sokolow, 490 U.S. at 9, 109 S.Ct. 1581.
B.
Applying these well-established principles, I would hold the frisk of Mr. Williams to be within the bounds delineated by Terry and supported by reasonable suspicion.
I begin by recalling the circumstances facing Officer Jesberger when Mr. Williams approached him because these circumstances must support a reasonable suspicion that Mr. Williams specifically was armed and dangerous. See Tinnie, 629 F.3d at 751 (“In determining whether an officer had reasonable suspicion, courts consider the circumstances known to the officer at the time of the [frisk].” (internal quotation marks omitted)). Officer Jes-berger knew that Mr. Williams and the other members of the group were in a high-crime area, relatively late at night, that the 911 call reported the presence of several firearms and that Mr. Williams and other members of the group refused to make eye contact with the police and attempted to move away from the scene upon the officers’ arrival.
As the majority notes, the Supreme Court has emphasized that reasonable suspicion is “a suspicion [about] the particular individual being stopped.” Cortez, 449 U.S. at 418, 101 S.Ct. 690. However, officers are not required to ignore facts that, by themselves, are insufficient to create a reasonable suspicion. Indeed, these facts are part of the totality of the circumstances and must be considered when assessing reasonable suspicion. See, e.g., Ocampo, 890 F.2d at 1368 (holding that although insufficient by itself, “[t]he information supplied by [an] informant [i]s just one factor among many” to consider when determining whether officers had “a reasonable and articulable suspicion”). Moreover, we consistently have found reasonable suspicion sufficient to justify frisks based on generalized, background facts in conjunction with particular facts about the suspect. See, e.g., Patton, 705 F.3d at 738-39 (considering factors “beginning with the general and moving toward the specific” that justified the officers’ reasonable suspicion, such as the “high-crime area of the city” where the frisk occurred, the time of night of the frisk, as well as the suspect’s “evasive behavior” and “nervous demeanor”); United States v. Oglesby, 597 F.3d 891, 894 (7th Cir.2010) (finding reasonable suspicion based on the suspect’s “behavior, coupled with the other circumstances,” such as the fact that the encounter with the suspect “occurred at night in a location that was known to the officers to be a high-crime area”); Brown, 188 F.3d at 865 (finding “reasonable suspicion that [the suspect] might be armed and dangerous which was sufficient to support [the officer’s] decision to conduct the pat-down search” when the suspect’s individual behavior was considered “[a]gainst th[e] background” of the stop’s location).
*697 The generalized facts outlined above were not the only circumstances confronting Officer Jesberger when he decided to frisk Mr. Williams. Rather, Mr. Williams did something that distinguished him from the rest of the group and that caused the officer to conclude that a frisk was necessary. The magistrate judge and the district court both credited Officer Jesber-ger's testimony at the suppression hearing:
[T]he thing that drew me to Mr. Wffliams was that his hands were in his pockets and he was kind of avoiding-everyone was avoiding eye contact with us and that's usually, based on my training and experience when people are avoiding eye contact and kind of trying to walk away from us, that's a pretty good sign that something is up.[ 1]
He also testified that, upon his request to Mr. Williams "to come over and speak with me," Mr. Williams initially replied "why"; Officer Jesberger then repeated his request, and Mr. Williams complied.[2] As Mr. Williams approached Officer Jes-berger, however, he kept his hands in his pockets. Observing the placement of Mr. Williams's hands, Officer Jesberger requested that Mr. Williams "to place both of his hands-take both of his hands out of his pocket. . .[3] He also decided "to conduct a pat-down for my safety and for the safety of everyone there due to the [weapons nature of the] call and due to him having his hands in a weapon area."[4] Of-fleer Jesberger explained that the location of Mr. Williams's hands was his "first and foremost concern," because
with a weapons call, if people have a gun, it's typically not going to be a place where I'm going to be able to see it. So it's either going to be in their pockets, their waistband, and that's where [Mr. Williams's] hands were, so that's why the concern was there.[ 5]
When asked if he was "concerned about officers' safety," Officer Jesberger responded that he was concerned "[f]irst and foremost [with the safety ofj the community and everyone else around there, as well as officer safety" based on the attendant circumstances and Mr. Williams's behavior.[6]
Courts since Terry have made clear that in assessing whether, under the totality of the circumstances, an officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," "due weight must be given to [the officer's] specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 24, 27, 88 S.Ct. 1868; see also United States v. Jackson, 300 F.3d 740, 746 (7th Cir.2002) (holding that the totality of the circumstances "include[ J the `experience of the law enforcement agent'" (quoting United States v. Odum, 72 F.3d 1279, 1284 (7th Cir.1995))); United States v. Andrade, 551 F.3d 103, 112 (1st Cir.2008) (holding that in forming a reasonable suspicion that a suspect may be armed and dangerous, an officer "may draw on his own experience and specialized training to make inferences from and deductions about the cumulative information ... that might well elude an untrained person" (internal quotation marks omitted)). Frequently, reasonable suspicion is found based on "the circumstances of the *698 encounter, in combination with [the officer’s] experience and training.” Oglesby, 597 F.3d at 895.
Based on his training and experience, Officer Jesberger believed that Mr. Williams was secreting a weapon because Mr. Williams approached him with his hands in his pockets. We have recognized that the placement of a suspect’s hands in his pockets or at his waistband is a legitimate consideration in assessing whether an officer is justified in believing that an individual is armed and presents a threat to himself or to others. See, e.g., United States v. Mitchell, 256 F.3d 734, 736 (7th Cir.2001) (finding reasonable suspicion where the frisking officer testified that, ‘“[f]rom past experience, [the fact that Mitchell’s hand was on the front of his waist] either signified that, one, they’re holding on to something in their waistband, be it a gun or drugs” and that “I strongly felt in this case, considering the shots fired call we had received and Mr. Mitchell’s action, that it was a — it was a gun in his case’ ” (alteration in original)); see also, e.g., United States v. Mays, 643 F.3d 537, 542 (6th Cir.2011) (identifying that the suspect “frantically dug his hands into his pockets” as one of the totality of circumstances justifying a frisk); Andrade, 551 F.3d at 113 (finding that the facts that “Andrade had his hands in his pocket[] and refused to make eye contact” contributed to officer’s objectively reasonable belief that he was in danger); United States v. Ellis, 501 F.3d 958, 962 (8th Cir.2007) (noting that suspect “act[ed] nervously and reach[ed] toward his pocket” among other factors that justified a frisk).
This particularized information about Mr. Williams’s conduct is significant because it distinguished Mr. Williams from the other members of the group and from merely “any person that had been around the area when the officers showed up that night,” Majority Op. at 688. His specific behavior, indicative of weapon possession, must be taken into account in determining whether the officer had a reasonable suspicion that Mr. Williams was armed and dangerous.
Mr. Williams’s placement of his hands in an area where weapons typically are secreted while in close proximity to a police officer must be considered in conjunction with the other circumstances confronting the officers — the report that some in the group were armed, evasive behavior upon the officers’ arrival, the high-crime location, time of the encounter and the presence of others nearby. Considering all of these factors, I conclude that they create a reasonable suspicion that Mr. Williams was armed and posed a risk to the safety of the officers and the public. Therefore, I would hold that Officer Jesberger was justified in conducting a protective frisk of Mr. Williams before conducting further investigation.
The majority’s decision creates an unworkable rule for police and disregards Terry’s concern for officer safety. The majority holds that a police officer is not entitled to conduct a protective frisk of a suspect whom “he is investigating at close range,” Terry, 392 U.S. at 24, 88 S.Ct. 1868, when the officer has received a report that some in the group of which the suspect is a part possess weapons and the suspect’s behavior indicates that he likely is armed. The majority offers no guidance to the police in this situation. What more must the suspect do before an officer can conduct a protective frisk? The majority does not say. How does the commanding officer of a police precinct explain today’s holding to his police officers before they take to the streets in the gang-infested areas of the major cities within this circuit?
*699 How much more risk must an officer be required to absorb before he can take minimal actions to protect himself? The Supreme Court stated in Terry that “to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm,” is “clearly unreasonable.” Id. This is the practical effect of the majority’s holding. It constitutes a major departure from the established case law of the Supreme Court and of this court. See Sup.Ct. R. 10.
For the foregoing reasons, I respectfully dissent.

. R.20at20.

. Id. at 12.

. Id. at 12-13.

. Id. at 13-14.

. Id. at 13.

. Id.