In the

# United States Court of Appeals

## For the Seventh Circuit

No 16-3732

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL A. FORD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:16-cr-40008-001 — **Sara Darrow**, *Judge.*

ARGUED JUNE 7, 2017 — DECIDED SEPTEMBER 20, 2017

Before RIPPLE, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* Michael Ford entered a conditional
guilty plea to possessing a firearm as a felon, 18 U.S.C.
§ 922(g)(1), preserving for this direct appeal his challenge to
the denial of a motion to suppress evidence. We uphold the
district court's ruling.

Ford and Cameron Hoefle were passengers in a car driv-
en by Tyler Mincks around 2:00 a.m. on December 4, 2015.

Mincks was stopped in Moline, Illinois, for a traffic violation, and police officers noticed two open beer bottles. The officers asked Mincks, Ford, and Hoefle to exit the car, and while frisking Ford they found a loaded, two-shot .38-caliber pistol. Ford was arrested, and the matter was referred to federal authorities for prosecution.

After his indictment, Ford moved to suppress the gun. He argued that he was frisked without reasonable suspicion and that the pat-down exceeded the scope of a protective frisk for weapons. (Ford also asserted that the initial stop of the vehicle was unlawful and that he did not receive *Miranda* warnings before making incriminating statements while in custody, but he has abandoned those contentions on appeal.) The government countered that the officers had reasonable suspicion to believe that Ford and his companions were armed and were about to avenge a shooting that had wounded Hoefle a few days earlier. The government also contended that the pat-down was reasonable in scope because, the prosecutor said, the officer who conducted the frisk had kept his hands outside of Ford's clothing until encountering a heavy object weighing down his jacket.

At an evidentiary hearing on Ford's motion, the sole witness was Joe Kluever, the Moline police officer who initiated the stop. According to Officer Kluever, the entire Moline police force had been alerted by e-mail that Hoefle suffered a gunshot wound on December 2. Police in neighboring Rock Island, Illinois, where the shooting occurred, suspected that Hoefle had stolen marijuana from Bryan Brinker, who then shot him. Even though he was wounded, Kluever said, Hoefle would not cooperate with Rock Island investigators, and neither did Mincks and Ford. Instead, the three men

said they would deal with the situation themselves. That threat, Kluever explained, had prompted Rock Island police to send an "officer safety" advisory to their counterparts in Moline. That December 3 advisory described the shooting of Hoefle and warned that he, Mincks, and Ford might go to Brinker's residence in Moline to retaliate. In turn, Moline officers received from their department the e-mail alert, which urged using "caution when dealing with all of the people involved."

That email was just 9½ hours old, said Officer Kluever when he noticed a car with three male occupants entering Moline from Rock Island around 2:00 a.m. on December 4. Kluever ran the license plate after all three occupants had looked away as they passed his marked car, and his inquiry revealed that the car was registered to Mincks. Kluever recognized Mincks's name from the e-mail alert and followed. Mincks made a series of quick turns through a residential neighborhood and eventually stopped at a red light. According to Kluever, though, the car had halted well into the intersection. He then stopped Mincks.

Officer Kluever and Officer Dan Boudry, who had been following Kluever in his own squad car, approached Mincks's car, and Kluever noticed an open beer bottle at the feet of Ford, who was in the front passenger seat. After removing the bottle from the car, Kluever said, he collected IDs from the three men and returned to his car to check them. What he learned, Kluever continued, was that all three occupants had extensive criminal histories and "alerts for … gang entries, weapons, drugs, that type of a thing" but no outstanding warrants. By then a sergeant had arrived, and all three officers now confronted the occupants of the car.

The sergeant noticed another open beer bottle tucked into the pocket on the back of Ford's seat, and the officers decided to remove Mincks, Ford, and Hoefle from the car to search for additional bottles.

Mincks followed by Hoefle exited the car and were frisked, but neither had a weapon. But as Mincks was climbing from the car, said Officer Kluever, Ford appeared nervous and "grabbed the handle of the door and started pushing" it open. In response Kluever told Ford to wait his turn. When Ford did exit at Kluever's direction, the officer right away focused on Ford's jacket because "it was sagging heavily as if something very heavy" was inside both front pockets. Kluever first compressed the right pocket and felt a phone and another object. "I could feel the bottom side" of the unknown object, Kluever testified, "and it felt like a handle." Kluever then asked what the unknown object was, and Ford said it was a phone. Kluever responded that he meant the other object, not the phone. He did not wait for Ford's answer, however, because the feel of a handle "could be indicative of a firearm." Kluever "reached in and retrieved" the small pistol. Kluever had "scrunched" Ford's pocket just two or three times before removing the gun.

The district court denied Ford's motion to suppress in an oral ruling. The court credited Officer Kluever and concluded that the totality of the circumstances, including the content of the e-mail alert and the fact that Mincks had been heading in the direction of the suspected target, gave the officers reasonable suspicion to perform a protective pat-down. And, the court continued, Kluever had not exceeded the permissible scope of a protective pat-down for weapons.

Ford then pleaded guilty but reserved the right to appeal the denial of his motion to suppress. He was sentenced to 57 months' imprisonment.

On appeal Ford first argues that the district court erred in concluding that Officer Kluever had reasonable suspicion to believe that he might be armed. Ford challenges only the frisk, not the stop of the car.

A police officer conducting an investigatory stop may frisk the suspect for weapons if the officer has an objectively reasonable suspicion that the suspect might be armed. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009); *Terry v. Ohio*, 392 U.S. 1, 27, 30–31 (1968); *United States v. Patton*, 705 F.3d 734, 737–38 (7th Cir. 2013); *United States v. Snow*, 656 F.3d 498, 501 (7th Cir. 2011). Certainty about the presence of a weapon is unnecessary; "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *see Snow*, 656 F.3d at 501. In reviewing a ruling on the lawfulness of a "*Terry* frisk," this court analyzes the district judge's factual findings for clear error but the judge's determination of reasonable suspicion de novo. *United States v. Barnett*, 505 F.3d 637, 639 (7th Cir. 2007).

Ford argues that Officer Kluever did not have reasonable suspicion to frisk him because more than nine hours had passed since the e-mail alert had been sent; the lapse of time, Ford insists, means that "the police were not confronting exigent circumstances." Ford also asserts that the e-mail could not supply reasonable suspicion because, Ford says, Hoefle's statements to police were vague and the e-mail does not describe a particular incident or threat that would lead a reader to believe that Ford was armed at the time of the stop. And,

Ford adds, the traffic stop occurred less than a block from Mincks's apartment, undermining the government's emphasis on the direction of the car. The government asserts that the frisk was justified by (1) the e-mail alert, (2) the 2:00 a.m. time and Mincks's route toward the potential target's home, (3) his evasive turns after seeing the police car, (4) the presence of open beer bottles in the car, (5) the officers' knowledge of Ford's involvement with gangs, weapons, and guns, (6) Ford's apparent nervousness while Mincks and Hoefle were being frisked, and (7) the sagging pockets of Ford's jacket.

We first note that the government has never argued that the police officers had probable cause to arrest Ford for violating Illinois's open container law, *see* 625 ILCS 5/11-502(b). By itself this obvious violation of law would have justified denying Ford's motion to suppress. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that police officer may arrest person who has committed "even a very minor criminal offense in his presence"); *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) (stating that search incident to arrest may occur before arrest is announced); *United States v. Leo*, 792 F.3d 742, 748 n.1 (7th Cir. 2015) (same); *United States v. Jackson*, 377 F.3d 715, 716–18 (7th Cir. 2004) (affirming denial of motion to suppress contraband when the defendant was originally arrested for a traffic violation). But the government's oversight does not matter because, as the district court concluded, the Moline police officers had reasonable suspicion to frisk Ford.

We agree with the government that reasonable suspicion to frisk Ford existed under these circumstances. The officers had been warned via e-mail that Ford and his companions

might seek to retaliate for the shooting of Hoefle two days earlier. Recent shootings, reports of discharged weapons, and indications of recent gang activity are factors that can contribute to reasonable suspicion. *See Patton*, 705 F.3d at 738–39; *United States v. Mitchell*, 256 F.3d 734, 737–38 (7th Cir. 2001). Ford and the others likely had been drinking, as evidenced by the beer bottles, and their alcohol use gave the police greater reason to worry that one of them "might do something unpredictable, unwise, and dangerous." *Patton*, 705 F.3d at 739; *see also United States v. Knight*, 562 F.3d 1314, 1327 (11th Cir. 2009) (stating that smell of alcohol contributed toward finding of reasonable suspicion). Moreover, the officers knew that all three men had extensive criminal histories. *See United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005) (explaining that officer's knowledge of suspect's criminal history, though not sufficient, is relevant to reasonable suspicion); *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (same).

Some of the government's other justifications for the frisk of Ford also are relevant, but those above, in our view, are most persuasive. Still, the government notes that the stop occurred around 2:00 a.m., and that a "nighttime traffic stop, especially in an area where crime is not a stranger, is more fraught with potential danger to an officer than would be a stop during the light of day." *United States v. Brown*, 273 F.3d 747, 748 (7th Cir. 2001); *see also United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011). Ford also appeared nervous while the officers removed Mincks and Hoefle from the car, and nervous movements can contribute to reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Tinnie*, 629 F.3d at 752. Much less significant, though, is the direction the car was headed, since, as Officer Kluever conceded

at the suppression hearing, the target's home was on the other side of Moline from where he spotted Mincks's car and the stop was close to Mincks's own home.

Ford attempts to liken this case to *United States v. Williams*, 731 F.3d 678 (7th Cir. 2013), in which we overturned a determination that a frisk had been reasonable. In *Williams* an anonymous 911 caller reported that a group of 25 men were brandishing guns outside a bar, but when the police arrived moments later they found only 8 to 10 men standing in the parking lot without any visible weapons. 731 F.3d at 681. The police focused on Williams and frisked him. Ford asserts that, like the phone call in *Williams*, the e-mail alert was vague because it did not detail how, when, or where the supposed retaliatory shooting was to occur. Ford also asserts that the e-mail did not describe contemporaneously occurring events or single him out as armed and dangerous.

*Williams* is distinguishable. The *Williams* panel focused on the fact that "neither Mr. Williams nor the group as a whole was acting illegally in any way," *Williams*, 731 F.3d at 688, but here Ford was part of a group that was violating Illinois's open-container law in full view of the officers. Also, in this case the police had a stronger basis for suspecting that the occupants of the car were armed because of the e-mail about *them*, in contrast with *Williams* where authorities were acting on an anonymous tip about unidentified men whom the officers could not even be sure were part of the group in the parking lot when they arrived. *Id.* at 680–81. And the group stopped in *Williams* was 8 to 10 men in a parking lot, which is "a group significantly less likely to be acting in concert" than a few "people travelling together in a car." *See United States v. Lyons*, 733 F.3d 777, 783 (7th Cir. 2013).

Ford next argues that Officer Kluever impermissibly exceeded the scope of a pat-down by "scrunching" his pocket several times. According to Ford, *Minnesota v. Dickerson*, 508 U.S. 366 (1993), establishes that it was unlawful for Kluever to continue manipulating the object when its incriminating character was not "immediately apparent." The government rightly responds that this court held in *United States v. Richardson*, 657 F.3d 521, 524 (7th Cir. 2011), that the "immediately apparent" restriction from *Dickerson* "does not apply until the officer concludes that the object at issue is not a weapon." Ford concedes in his reply brief that *Richardson* decided as much, but attempts to distinguish that decision on the basis that the defendant in *Richardson* tried to flee from police while they were searching him. But that difference is not relevant to whether an officer exceeded the scope of a permissible frisk for weapons. An officer encountering a small, hard object may have reasonable suspicion to believe that object is a weapon, s*ee Richardson*, 657 F.3d at 524; *United States v. Brown*, 188 F.3d 860, 865–66 (7th Cir. 1999); *see also United States v. Robinson*, 615 F.3d 804, 808 (7th Cir. 2010) (noting that officer was "entitled to assure himself that his first impression" of a hard object was correct by continuing a frisk "a minute or so" later), and the "handle-like" object that Officer Kluever said he felt fits that category.

AFFIRMED.